## Love *v.* Pamplin and others.

*(Circuit Court, W. D. Tennessee. October 6, 1884.,*

1. **Indian Treaty—Chickasaw Treaty of July 1, 1834—Treaty of Pontotoc of March 1, 1833—Effect on State Laws—Constitutional Law.**

   Under the Chickasaw Indian treaty of July 1, 1834, as interpreted by the previous treaty of Pontotoc of March 1, 1833, to which it was a supplement, state legislation that interferes with the national rights of the Chickasaw Indians, while in possession of lands under the tribal organizations, is extraterritorial, and, so far as conflicting with rights secured by the treaty, unconstitutional; and rights once vested under the treaty are beyond the power of state legislation, even after the removal of the Indians.

2. **Same—Real Estate—Conveyance of Indian Reservations**

   It was competent for the United States by treaty, notwithstanding any state law, to prescribe the conditions to the conveyance of Indian lands which should be the law of the title. But on the extinguishment of the original Indian title, and the removal of the Indians from the state, the laws of the state would come into operation, except so far as modified by the existing treaties and laws of the United States.

3. **Same—Voluntary and Involuntary Conveyances.**

   The restrictive clauses of the foregoing treaties upon the alienation of Indian lands provided that the reservations to individuals should not be "sold, leased, or disposed of" except in the particular manner pointed out by the treaty, but the terms of the treaty apply only to voluntary conveyance by the Indians, such as were effected by the personal will of the possessor, and not to transmissions of title by operation of law, except where provision is especially made for a peculiar descent on the death of the possessor.

4. **Same—Attachment Sale of Indian Lands.**

   Where, therefore, the possessor of an Indian reservation of individual lands left his land and rejoined his tribe in the Indian nation, in consequence of which absence from the state the land was attached at the suit of his creditor and sold by the sheriff, the purchaser at the sale took a good title, which must prevail over the claim of title by his heirs at law, under the tribal laws of descent or the ordinary laws of the state.

In Equity.

*Poston & Poston* and *Lowry W. Humes,* for plaintiff.

*Wright & Folkes, R. D. Jordan, W. S. Flippin,* and *George Gantt,* for defendants.

Matthews, Justice. As originally commenced in the chancery court of Shelby county, Tennessee, this suit was a bill in equity to recover possession of real estate lying in that county, to which the plaintiff claimed the legal title. In that form it could not be main-

tained in this court, the remedy of the plaintiff being at law. The case is one that arises under a treaty of the United States with the Chickasaw tribe of Indians, and on that ground was removed from the state court, and in this court, by stipulation of parties, has been converted into an action at law for the recovery of the land in question, and submitted to the court, without the intervention of a jury, upon an agreed statement of facts.

The treaty under which the case arises was concluded May 24, 1834, and proclaimed July 1, 1834, between the United States and the Chickasaw Nation of Indians. 7 St. 450–457. As it was supplementary to the treaty of Pontotoc, negotiated between the same parties in October, 1832, and ratified March 1, 1833, it is necessary to bring into view the principal provisions of the latter to understand rightly the meaning of the former. 7 St. 381–391.

By the treaty of Pontotoc the Chickasaw Nation ceded to the United States "all the land which they own on the east side of the Mississippi river, including all the country where they at present live and occupy." This land the United States agreed to survey and sell as other public lands, and as a compensation therefor to pay to the Chickasaw Nation, from time to time as received, all the net proceeds of such sales. This cession was made in view of a removal of the Indians to a new home west of the Mississippi river; but they were not to be deprived of the comforts of a home in the country in which they were then living until they were provided for in the new possessions. In the mean time it was agreed that out of the surveys made by the United States each Chickasaw family should select and hold a comfortable settlement for cultivation, the uninterrupted use and possession of which, until a new home was found, was guarantied by the United States, after which these reserved tracts were to be sold and accounted for as the rest. By an explanatory article of this treaty it was further provided "that no family or person of the Chickasaw Nation who shall or may have tracts of land reserved for their residence, while here, shall ever be permitted to lease any of said land to any person whatsoever, nor shall they be permitted to rent any of said land to any person, either white, red, or black, or mixed blood of either." It was also provided "that whenever the nation shall determine to remove from their present country, that every tract of land so reserved in the nation shall be given up and sold for the benefit of the nation. And no individual or family shall have any right to retain any of such reserved tracts of land for their own use any longer than the nation may remain in the country where they now are." By the ninth article of the treaty of 1832, "the Chickasaw Nation express their ignorance, and incapacity to live and be happy under state laws; they cannot read and understand them, and therefore they will always need a friend to advise and direct them." At their request, therefore, the United States agreed to keep an agent with them, as theretofore, "so long as they live within the jurisdiction

of the United States as a nation, either within the limits of the states where they now reside or at any other place." It was also stipulated that when the Chickasaw Nation should determine to remove to new homes, the United States should advance the necessary means for their transportation, and for one year's subsistence after they reach their new homes, payable out of the proceeds of the sales of the ceded lands; and provision was also made that a principal sum arising from the sales should be permanently invested and held by the United States for the benefit of the Chickasaw Nation, the interest on which might be applied for their national purposes.

This is the substance of the most material provisions of the treaty of Pontotoc, to modify which the treaty of 1834 was negotiated. The latter recites that "the Chickasaws are about to abandon their homes, which they have long cherished and loved; and, though hitherto unsuccessful, they still hope to find a country adequate to the wants and support of their people somewhere west of the Mississippi, and within the territorial limits of the United States." Another article (the third) declares that "the Chickasaws are not acquainted with the laws of the whites, *which are extended over them;*" and complains of intrusions into their country and upon their rights, which can only be restrained by the military force of the country, which they are unwilling to ask for or see resorted to, and therefore only stipulate that the agent of the United States residing among them will resort to every legal civil remedy to prevent intrusions upon the ceded country, and remove the trespassers from selected reservations; and that, if property be taken by persons of the United States, the agent shall pursue all lawful civil means, which the laws of the state permit in which the wrong is done, to regain the same, or to obtain a just remuneration; and in default thereof the United States will make payment for the loss sustained.

Article 4 provides as follows:

"The Chickasaws desire to have within their own direction and control the means of taking care of themselves. Many of their people are quite competent to manage their affairs, though some are not capable, and might be imposed upon by designing persons. It is therefore agreed that the reservations hereinafter admitted shall not be permitted to be sold, leased, or disposed of, unless it appear by the certificate of at least two of the following persons, to-wit, Ish-ta-ho-ta-fa, the king: Levi Colbert, George Colbert, Martin Colbert, Isaac Alberson, Henry Love, and Benj. Love, of which five have affixed their names to this treaty, that the party owning or claiming the same is capable to manage and to take care of his or her affairs; which fact, to the best of his knowledge and information, shall be certified by the agent, and, furthermore, that a fair consideration has been paid; and thereupon the deed of conveyance shall be valid: provided, the president of the United States, or such other person as he may designate, shall approve of the same, and indorse it on the deed; which said deed and approval shall be registered at the place and within the time required by the laws of the state in which the land may be situated; otherwise, to be void. And when such certificate is not obtained, upon a recommendation of a majority of the delegation and the approval of the agent, at the discretion of the president of the United States, the same

may be sold; but the consideration thereof shall remain a part of the general Chickasaw fund in the hands of the government until such time as the chiefs, in council, shall think it advisable to pay it to the claimant, or to those who may rightfully claim under said claimant, and shall so recommend it." 7 St. 451.

By the fifth article of this treaty the fourth article of the treaty of Pontotoc was changed so as to grant reservations in fee to heads of families proportioned in the number of sections to the size of the families, respectively; and by the sixth article, similar reservations of a section each to persons not heads of families, a list of which was to be made by the seven persons named in article 4. It was further provided that "in these and in all other reserves where the party owning or entitled, shall die, the interest in the same shall belong to his wife, or the wife and children, or to the husband, or to the husband and children, if there be any; and in cases of death, where there is neither husband, wife, nor children left, the same shall be disposed of for the general benefit, and the proceeds go into the general Chickasaw fund. But where the estate, as is prescribed in this article, comes to the children, and, having so come, either of them die, the survivor or survivors of them shall be entitled to the same. But this rule shall not endure longer than for five years, nor beyond the period when the Chickasaws may leave their present for a new home." 7 St. 452.

On November 16, 1840, a patent was issued by the United States to George G. Allen in fee-simple for two and a half sections of land, embracing the tract in controversy in this suit, which recites that the grantee was entitled to it under the fifth article of the treaty of 1834. It is admitted that Allen was a Chickasaw Indian, and that he was in possession of these lands until he removed into the Indian country in 1845 and rejoined the tribe, which had gone there in 1834. He died in the Indian territory many years ago, but in what year does not appear, leaving Elsie, his daughter and only child, his heir at law. She married the plaintiff, Henry Love, also a Chickasaw Indian, both of whom always resided in the Indian territory until Elsie died, in 1877, leaving no will and no issue. The plaintiff, as her surviving husband, claims under the tribal laws to be her heir at law, and as such claims the land in controversy; it being admitted that George G. Allen, in his life-time, never parted with his title by any voluntary conveyance or disposition thereof.

The defendants in possession claim title by sundry mesne conveyances from Allen and Apperson, who, it is also claimed, acquired the title of George G. Allen by a deed purporting to convey the same, made to them by the sheriff of Shelby county, Tennessee, within which the land lies, dated April 12, 1849. This deed was made in pursuance of a sale on September 4, 1848, under an execution in favor of Allen and Apperson against George G. Allen and his wife, founded on a judgment in an attachment suit in the circuit court of Shelby county,

rendered May 8, 1848, at which the plaintiffs in the execution were purchasers. George G. Allen, it is admitted, was not personally served with process in the action, and did not voluntarily appear, but the attachment was levied on the lands in question, and the defendants were notified by publication. It is not questioned but that the proceedings in the attachment suit were in all respects regular, and in conformity with the laws of Tennessee; but it is objected that they are void *ab initio*, and cannot be the legal basis of a title to the land in controversy, for the reason that, by the terms of the treaty with the Chickasaws of 1834, this land, in common with all similar reservations, was withdrawn from the jurisdiction and process of the state courts, and from the operation of all state laws affecting the title to it. As a matter of fact, by direct and express legislation on the part of Mississippi and Tennessee, the laws of those states respectively had been extended over the territory occupied and owned by the Chickasaw Nation, in respect to all persons and property therein prior to the removal of the Indians beyond the Mississippi river; with what effect, after that event, is the very question for determination in this case.

This legislation, it must be admitted, on the authority of the decision of the supreme court in the case of *Worcester* v. *State*, 6 Pet. 515, so far as it interfered with the national rights of the Chickasaw Indians while in possession of the lands under their tribal organization, was extraterritorial, and, so far as it conflicted with rights secured by any treaty or law of the United States in pursuance of the constitution, was unconstitutional and void. And any such rights, once vested, became fixed and irrevocable, and beyond the reach of state legislation, even when, by the extinction of the Indian title on the removal of the tribe beyond the state limits, the legislative authority of the state had become acknowledged and exclusive. It was competent, therefore, for the United States, by the treaty of 1834, to affix conditions to the conveyance of the reservations created by it, which should be the valid law of the title, notwithstanding any conflicting state law. *Smith* v. *Stevens*, 10 Wall. 321. But after the extinguishment of the original Indian title and the disappearance from the state limits of the tribal organization by the removal of the body of Indians, or otherwise, the law of the state would come into full operation and effect over persons and property within the former limits of the Indian nation, except as modified by vested rights under existing treaties and laws of the United States. It follows, therefore, that after the migration of the Chickasaw Nation west of the Mississippi river in 1834, the laws of Tennessee came into full effect over persons and property of the individual remnants found thereafter within the territorial limits of the state, including, consequently, the lands now in controversy, subject, however, to any rights secured by treaty with the United States. In all cases not provided for by the latter, the law of the state will apply and govern, and the treaty

and local law must be construed together, so that both shall stand as far as they can be reconciled; the law of the treaty prevailing in case of unavoidable conflict.

It becomes a question, therefore, in the first instance, of the true meaning of the treaty, and, looking at its provisions in the light of the circumstances, and of the natural and obvious meaning of the language in which they are expressed, and of the context, it appears to be clear that the intention of the instrument limits the clauses restrictive of alienation, as to the lands reserved to individuals, to cases of voluntary conveyances. The language of the prohibition is that the reservations shall not be *"sold, leased, or disposed of;"* and, although the words last used, *"disposed of,"* might seem to embrace other dispositions than those of sale and lease, yet they cannot, upon the principle *noscitur a sociis,* be extended so as to include any other than those of a character like those specially named; that is, of a voluntary nature, effected by the personal will of the possessor. This seems to be rendered quite certain by the requisition that limits the qualification to cases of deeds of conveyance on which the approval of the president of the United States must be indorsed; and that deed, when properly executed and approved, is made subject to the registry laws of the state in which the land may be situated. Besides this reference, there are others in the treaty which seem to assume and declare the prevailing force of state laws, where not interrupted by the supreme authority of the United States. Article 3 declares the submission of the Indians to that condition as a necessary result of their situation; complaining, it is true, that they are not acquainted with the laws of the whites, which, nevertheless, are extended over them, and asking the interposition of the United States not to displace those laws by force, but only such redress for wrongs done them as those laws permit, and, on failure of justice from that source, compensation by the government of the United States. And the special rules for the transmission of the reservations by descent in case of death is limited in article 6 to a period terminated by the migration of the Indian nation to new settlements, and not to exceed five years in any event.

It was certainly contemplated, as part of the scheme provided for by the treaty of 1834, that the owners of reservations, at least such as chose to remain on them after the migration of the tribe, should be capable of transacting business and of making all necessary contracts to that end. It is a consequence of that supposition that they might render themselves liable to suit, which could be, of course, only according to the laws of the state in which they resided and contracted. And this involved the contingency of subjecting their lands, held by them, as in the present case, by a fee-simple title, to levy and sale on mesne and final process, as in case of other lands of like nature held by all other persons. Such a disposition of the reservations is not within the prohibition of the treaty, but, on the

contrary, by clear implication, is permitted by it. It follows, from these views, that the proceedings and sale in the attachment suit of Allen and Apperson divested the title of George G. Allen, the patentee, and are valid and effectual as a foundation of the title of the defendants. This conclusion is supported by express adjudications in the cases of *Lowry* v. *Weaver*, 4 McLean, 82, decided by the circuit court of the United States for Indiana, and of *Saffarans* v. *Terry*, 12 Smedes & M. 690, by the supreme court of Mississippi. And these are not inconsistent with any of the decisions cited and relied on by the counsel for complainant.

This conclusion renders unnecessary the consideration of any other question in the case. The bill is accordingly dismissed.

HAMMOND, J., concurred.