REDWINE *et al.* v. ANSLEY *et al.*

No. 1243.   Opinion Filed March 19, 1912.

(122 Pac. 679.)

1.   **INDIANS—Allotted Lands—Liability for Debts of Deceased Allottee.**   Under the treaty between the United States and the Choctaw and Chickasaw Tribes of Indians, known as the "Atoka Agreement," the allotted lands of the deceased members of either of such tribes, after such lands have passed to the heirs of the deceased, cannot be sold by creditors of deceased to satisfy debts or obligations incurred by him prior to the time at which such lands were to become alienable.

2.   **SAME—Exemptions.**   Rents and profits from the allotted lands of a deceased Choctaw or Chickasaw Indian, accruing after the death of allottee, after they have been collected and paid to the heirs, cannot be subjected by creditors of deceased to the payment of debts or obligations incurred by deceased prior to the time his allotments were alienable.

(Syllabus by Harrison, C.)

*Error from District Court, Pittsburg County;*
*Preslie B. Cole, Judge.*

Action by W. N. Redwine and others against William Ansley and others.   Judgment sustaining defendants' demurrer, and plaintiffs bring error.   Affirmed.

*W. N. Redwine* and *Wiley H. Jones,* for plaintiffs in error.

*Arnote & Monk,* for defendants in error.

Opinion by HARRISON, C.   This was an action, filed April 12, 1909, in the district court of Pittsburg county by W. N. Redwine and Wiley H. Jones, in behalf of themselves and other alleged creditors of W. H. Ansley, deceased, against Wm. Ansley, Gilbert Ansley, Joseph Ansley, and Irene Richards, heirs of deceased.   The deceased, a Choctaw Indian by blood, owned, at the time of his death, certain tracts of land allotted to him under the provisions of the treaty known as the "Atoka Agreement" and "Supplemental Agreement," between the United States

and the Choctaw and Chickasaw Tribes of Indians. The plaintiffs seek judgment against the heirs of deceased for debts incurred by deceased during his lifetime, and to subject the estate of deceased, after it had passed to the heirs, to the satisfaction of said debts, and ask for a receiver to take charge of the estate and dispose of same in satisfaction of said indebtedness. The petition in error, petition in the court below, demurrer to same, and order of the court below sustaining the demurrer, constitute the material parts of this record. The petition reads as follows:

"W. N. Redwine and Wiley H. Jones, Plaintiffs, v. William Ansley, Gilbert Ansley, Joseph Ansley, Irene Richards, Defendants. Petition.

"Plaintiffs, who sue in behalf of themselves and all other creditors, respectfully show to the court that W. H. Ansley departed life, testate, on or about the 1st day of April, 1905, and naming in his last will and testament W. A. Walker as his executor; that the said W. H. Ansley was a Choctaw Indian by blood, and as such died seised and possessed of an allotment of land in the Choctaw Nation, which is described as follows, to wit: The N. E. ¼ of the N. E. ¼, and the S. ½ of the N. E. ¼, and the S. E. ¼ of the S. E. ¼ of the N. W. ¼ of section 29, and the W. ½ of the S. W. ¼ of the N. W. ¼ of section 28, all in township 6 N., range 14 E., in Pittsburg county, state of Oklahoma, and included in homestead patent No. 2,111. The N. E. ¼ of the S. E. ¼ of the N. W. ¼, and the S. W. ¼ of the S. E. ¼ of the N. W. ¼, and the S. ½ of the S. W. ¼ and the ½ of the N. ½ of the S. ½ of section 29, township 6 N., range 4 E., and the S. E. ¼ of the N. E. ¼ of section 16, township 5 N., range 14 E., Pittsburg county, Oklahoma, and all included in allotment patent No. 1,489, amounting in all to 310 acres.

"Plaintiffs state further to the court that this is all the property of which said deceased, W. H. Ansley, died seised and possessed, in so far as they have any knowledge, except a small amount of personal property, which was not more than sufficient, if sufficient, to pay the funeral expenses of the deceased and the expenses incident to his last illness.

"Plaintiffs further state that the last will and testament of the deceased, W. H. Ansley, is in the following words and figures, to wit:

" 'In the name of. God, Amen.   I, William Henry Ansley, being of sound mind and memory, but knowing the uncertainty of human life, do now make and publish this my last will and testament, that is to say:   Notify W. A. Walker of McAlester, I. T., and request him to be appointed administrator.of my estate, pay all debts and divide the remainder equally among two brothers, one sister and my father and W. A. Walker.   William Henry Ansley.   [ Seal.]

" 'Signed, sealed, published and declared by the said William Henry Ansley, the testator, as and for his last will and testament, and we, at his request and in his presence and in the presence of each other, have hereto subscribed our names as witnesses thereto, this 28th day of April, 1904.   [Signed.]   John Raleigh.   Frank Smith.   Frank Craig.   H. E. Williams.'

"That the said W. H. Ansley, deceased, left surviving him as his sole next of kin his father, Wm. Ansley, and two brothers, Gilbert and Joseph Ansley, and one sister, Irene Richards, formerly Ansley, who are all residents of Pittsburg county, Okla.

"Plaintiffs further state that the said executor, W. A. Walker, duly qualified as such and entered upon the discharge of his duties, received the various claims, and filed them, that were exhibited to him, as executor, against the estate of W. H. Ansley, deceased, and paid off such obligations as the personal property of the deceased which came to his hands would meet, and proceeded, as executor of said estate, to take charge of the allotment of the deceased, heretofore described, and rent or lease the same to various tenants, and this he continued to do up until about October, 1907, and in the meantime there accumulated upon his hands, as rents and profits arising from said allotment, something more than the sum of $700.

"Plaintiffs further show to the court that the said deceased, W. H. Ansley, was never married; that he never became the head of a family; that he left surviving him no descendants, but only ascendants and collateral as next of kin, as heretofore stated. Plaintiffs further show to the court that on or about the 4th day of October, 1907, the defendant Wm. Ansley, father of the deceased W. H. Ansley, contending that he was entitled by inheritance to a life estate in said allotment, and that the deceased, W. H. Ansley, being a Choctaw Indian by blood, was without power to convey said allotment in his will, made application to the United States Court at McAlester to have said allotment taken out of the hands of said executor and turned over to him as a life tenant, and an order was made by the court accordingly.

"Plaintiffs further state that a short time subsequent to this action, as they are informed and believe, that the rents and profits in the hands of said executor accruing from said allotment, as heretofore described, were also by said executor, in connection with said allotment, transferred and turned over to said Wm. Ansley, who is now holding, occupying, using, and controlling said allotment and appropriating to his own use the rents and profits of said allotment turned over or transferred to him by the executor, as before stated.

"Plaintiffs further state that they are *bona fide* creditors of the said W. H. Ansley, deceased; that a short time prior to his death they became surety for him to the First National Bank of McAlester in the sum of $95, as they now remember, which sum matured, as they believe, on or about the 11th day of May, 1905, and which, not being discharged at maturity or before, either by said W. H. Ansley or his executor, W. A. Walker, has been by plaintiffs renewed from time to time, they executing in said renewals to said bank their individual note, until the sum now due amounts, perhaps, or about as they remember, to $130 or probably more, which plaintiffs allege to be justly due them as sureties of the said W. H. Ansley, deceased, and that the same is subject to no offset or credit of which they have any knowledge. A copy of the note representing the amount now due will be found as an exhibit to this complaint, and marked 'A.'

"Plaintiffs further show to the court that the said W. H. Ansley, deceased, is largely indebted to various other creditors, to wit, to the First National Bank of McAlester, or to the sureties on his undertaking to the said bank, in the sum of $530, with interest, to the American National Bank or to the sureties on his undertaking, in the sum of $75, with interest, to W. A. Walker in the sum of $365.50, with interest, to C. Springer, or the sureties on his undertaking to said Springer, in the sum of $380.84, and to Coal City Savings Bank or its successors, or the sureties on his undertaking, in the sum of $332, with interest, aggregating, without interest, the sum of $1,773.34. Said W. H. Ansley, as plaintiffs are informed and believe, also owes various other persons various amounts, and plaintiffs state that, as they are informed and believe, there are no assets in the hands of said executor with which to liquidate the debts of the deceased, and that said executor is unable to pay the same, and that said estate of the deceased is insolvent.

"Plaintiffs further state that, while it might be true, owing to the limitations with which the testamentary capacity of a Choc-

taw Indian by blood have been alleged to be hedged about, that the said W. H. Ansley, deceased, while not in any sense intending to admit this to be true, might have been incapacitated to dispose of his allotment by last will and testament, still, this restriction or want of power to convey by last will and testament would, in no sense, signify or indicate that said allotment, upon the death of said W. H. Ansley, deceased, passed to his next of kin, free from the claims and rights of creditors, and especially would this be true as to the rents and profits arising from said allotment; and plaintiffs aver that said William Ansley could only take said allotment and the rents and profits arising from the same in trust for the use and benefit of all the *bona fide* creditors of W. H. Ansley, deceased, and that he could not take the same, or any interest therein, by any rule of law or justice, and hold and appropriate the same to his own use, to the detriment and disparagement of the creditors of the deceased, W. H. Ansley.

"Plaintiffs further state upon information and belief that other creditors of the said W. H. Ansley, deceased, are threatening and are liable to bring suit against his estate, so that the same is in great danger of being consumed or largely consumed, by a multiplicity of suits.

"The premises considered, the plaintiffs pray:

"(1) That they be allowed to file this as a general creditors' bill in behalf of themselves and all other creditors of the said W. H. Ansley, deceased, and that the bill be by your honor sustained as such.

"(2) That all those named as defendants in the caption of this complaint be made such by the issuance and service of all proper process, and that they be required to answer this complaint fully and truly, but not on oath; their oaths being waived.

"(3) That all of the *bona fide* creditors of the deceased, W. H. Ansley, be required to prosecute their claims and demands against the estate of the said W. H. Ansley, deceased, in this court and in this cause, and to that end that they be allowed to file their petitions in term or in vacation, exhibiting their respective claims and demands, and prove the same before the referee or master in chancery, and that they be granted all the benefits of this proceeding to which plaintiffs may be entitled, and that the referee or master in chancery be directed, by due publication, to notify all the creditors of the said W. H. Ansley, deceased, o file their claims in this cause; that judgment be rendered against the defendant Wm. Ansley for the amount of rents

and profits that he has received, and also that were turned over to him by said executor, arising from said allotment, heretofore described, of the said W. H. Ansley, deceased.

"(4) That a receiver be appointed to take into his possession the said allotment and all notes and other evidence of indebtedness arising from the rents and profits of said allotment now in the possession of the defendant Wm. Ansley, and that said receiver be, and is hereby, empowered and directed to proceed at once to collect from the defendant Wm. Ansley any and all sums that he may receive arising from the rents and profits from said allotment, and that whatever notes or other evidence of indebtedness that may now be or standing, representing rents and profits arising from said allotment, that, as the same mature, said receiver be, and the same is hereby, authorized, empowered, and directed to bring all suits necessary to collect said sums, heretofore mentioned and to do all other acts necessary to collect or protect the assets of the estate of the said W. H. Ansley, deceased.

"(5) That all the rents and profits, heretofore indicated, arising from said allotment be first collected in by said receiver and prorated among all the creditors of the deceased, W. H. Ansley, and to the payment of costs and expenses of this action; and, if the same should be insufficient to satisfy the claims of creditors and costs that said receiver be, and is hereby, authorized and empowered to sell said allotment and apply the proceeds of the same, as heretofore indicated, as rents and profits arising therefrom.

"(6) Plaintiffs further pray that said receiver be, and is hereby, authorized and empowered to take charge of said allotment, and lease or rent the same until such time as he shall have collected in the rents and profits so received by him, by or from said allotment up to the time of the filing of this bill, and if said rents and profits, when so collected in by said receiver, are found insufficient to satisfy the claims and demands of all *bona fide* creditors of the said W. H. Ansley, deceased, together with the costs and expenses of this receivership, then, and in that event, that said receiver be, and is hereby, authorized to sell said allotment and apply the proceeds of said sale as heretofore indicated; but, in the event that this court should find that said allotment cannot be subjected to the claims of creditors in this action, then, and in that event, plaintiffs pray that said receivership be continued until such time as the rents and profits arising from said

allotment are sufficient to satisfy the claims of all creditors and all costs and expenses incident to this action.

"(7) That the referee or master in chancery be directed to take and state an account showing: (1) The assets of the estate of the said W. H. Ansley, deceased. (2) The names of the preferred creditors, if any, and the amount due each, and the particular asset on which each has a lien or superior equity. (3) The names of the general creditors and amount due each. (4) The probable amount of the costs and expenses of this action, including the expenses and compensation of the receiver and reasonable counsel fees. (5) The prorating of the general creditors out of the fund subject to distribution among them.

"(8) That plaintiffs and other creditors of the said W. H. Ansley be granted all such other and further relief as they may be entitled to in law or equity.

"REDWINE & BONESTEEL,
"JONES & KEITH,
"Solicitors for Plaintiffs.

"State of Oklahoma, Pittsburg County.

"Wiley H. Jones makes oath that the statements in the fore going complaint, made of his own knowledge, are true, and that those made on information and belief he believes to be true. Sworn to and subscribed to before me, this the 8th day of April, 1909 [Signed] Wiley H. Jones, by W. B. Riley, Clerk. C. J. Hefley, Deputy."

Plaintiffs in error submit three assignments of error:

(1) "The court erred in sustaining the demurrer of appellees and in dismissing appellants' petition. This action, of the court was error, because not supported either by the facts, as set up in the petition filed in the court below, or by the law."

(2) "The court erred in refusing the application of appellants for the appointment of a receiver. This was also error both upon the law and the facts, as such facts appear from the averments of the petition filed in the court below."

(3) "The court erred in not overruling appellees' demurrer to the petition of appellants and proceeding to trial of the case upon its merits upon proper issues joined."

In considering the three assignments of error, we are inclined to treat them as one, inasmuch as each assignment directs us to the same question of law, viz.: Does the petition state facts sufficient to constitute a cause of action against the defendants, or either of them? A determination of this question

logically settles the question whether the court erred in sustaining the demurrer, whether it was error to deny the application for a receiver, upon the facts alleged in the petition, and whether the court erred in *not* overruling the demurrer. If the petition stated a cause of action against the defendants, or either of them, then the court erred in sustaining the demurrer. If it did not, then the demurrer was correctly sustained, the application for receiver was properly denied, and the court was right in not overruling the demurrer. Therefore a determination of this one question decides this case.

Counsel for plaintiffs in error, in their brief, suggest that a determination of this action is predicated upon two propositions, viz.:

(1) "Does land allotted to a member of the Choctaw Nation or Tribe of Indians, who has never been married, and who dies without issue, pass to ascendants or collaterals, free from the debts of such allottee contracted prior to the time that said land became alienable?

(2) "Do the rents and profits of lands allotted to a member of the Choctaw Nation or Tribe of Indians, upon the death of the allottee, pass to ascendants or collaterals, free from debts of the allottee contracted prior to the time said lands were alienable?"

This contention, we think, is correct, as the question before us is the sufficiency of the petition, and an answer to these two propositions determines whether the facts alleged in the petition are sufficient to constitute a cause of action.

As to the first proposition, we deem it immaterial whether the deceased allottee was a single man or a married man, or whether his estate passed to direct or collateral heirs. Counsel seem to argue that the question might have a different effect on direct heirs to that which it might have on collateral heirs, and we concede that there might be a reason for a distinction; but the provisions of the Atoka Agreement make no such distinction. The question is: Does land allotted to a member of the Choctaw Nation or Tribe of Indians pass to his heirs free from the debts of such allottee contracted prior to the time the allotment became

alienable, under the treaty in force between such tribe of Indians and the United States? And it is immaterial in settling this question whether the estate passed to the heirs by will, or under the law of descent and distribution then in force. Section 29 of the act of Congress of June 28, 1898, c. 517, ratifying the treaty between the United States and the Choctaw and Chickasaw Tribes of Indians, known as the "Atoka Agreement" (30 St. at L. 495), provides:

"All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, *and which shall be inalienable for twenty-one years from date of patent.* This provision shall also apply to the Choctaw and Chickasaw freedman to the extent of his allotment. Selections for homestead for minors to be made as provided herein in case of allotment, and the *remainder* of the lands allotted to said members shall be alienable for a price to be actually paid, *and to include no former indebtedness or obligation*—one-fourth of said remainder in one year, one-fourth in three years, and the balance of said alienable lands in five years from date of patent. That all contracts looking to the sale or incumbrance in any way of the land of an allottee except the sale hereinabove provided, shall be null and void." (Italics ours.)

This treaty was supplemented by a subsequent treaty between the Choctaw and Chickasaw Nations or Tribes of Indians and the United States, which treaty was ratified by act of Congress of July 1, 1902, c. 1362, 32 St. at L. 641, section 12 of which provides:

"Section 12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be. which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead."

"Section 15. Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt, or obligation

of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided."

"Section 16.   All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows:   One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent:   Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

It is suggested by counsel for plaintiffs in error, in their brief, that the two acts above quoted 'from are *in pari materia,* and should therefore be construed together, citing *Nelson v. Fightmaster,* 4 Okla. 38, 44 Pac. 213, *Jordan v. Gower,* 1 Baxt. (Tenn.) 103, and *Cook v. Allee,* 119 Iowa, 226, 93 N. W. 93, all of which we have carefully examined.   In all of these authorities, however, the courts construe separate legislative enactments of their respective states on the subject of exemptions; and, while the same rule might apply in construing an exemption law as in construing a restrictive law, the one extending a privilege, the other imposing a restriction, yet we find nothing in these authorities that should control in the question before us.   The question here is whether, in both acts, it is not the evident intention of Congress to protect the allottee against designing and unscrupulous persons, who might take advantage of his inexperience in business affairs, as well as against his own improvident acts. And, from a careful study and comparison of the two acts, as well as the conditions leading up to and necessitating such an agreement or treaty, we conclude that the controlling thought in this feature of both agreements, on the part of Congress and also on the part of the commissioners representing the Choctaw and Chickasaw Nations of Indians, was to protect the allottee in his title to his land until such time as he might be able to better protect himself, until he should become better acquainted with the business world, and be better qualified to protect his

interests. The act itself is entitled "An act for the protection of the people of the Indian Territory, and for other purposes."

This being the moving intent on the part of both parties to these treaties, we think their language on this point should be given its very strongest meaning. It would have been useless to offer a protection that was inadequate, and, under the conditions then existing, the provisions of the treaty would have been inadequate and ineffectual, unless they provided an absolute inhibition against alienation of the land, and also provided against the subjection of such lands to the payment of debts contracted by the allottee during the time he was considered incapable of managing his own affairs. And whether we construe the two acts together, or construe them separately, we can reach but one conclusion. The act of June 28, 1898 (section 29), among other things, provides: ˙

"And the remainder of the land allotted to said members shall be alienable for a price to be actually paid (and to include no former indebtedness or obligation, etc.). That all contracts looking to the sale or incumbrance in any way of the land of an allottee, except the sale herein provided, shall be null and void."

The act of July 1, 1902 (section 15), provides:

"Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt or obligation of any character contracted prior to. the time at which such land may be alienable under this act, nor shall said lands be sold except as herein provided."

There seems to be no conflict in the two acts in meaning, so far as they relate to restrictions against alienation, or to debts incurred prior to the time the lands became alienable. If there is any conflict, however, then the provisions of the latter act control, as section 68 of the latter act provides:

"No act of Congress or treaty provision, nor any provision of the Atoka Agreement, inconsistent with this agreement, shall be in force in said Choctaw and Chickasaw Nations."

Both acts plainly prohibit the allottee from conveying title to his allotments until after they become alienable; and both acts, in effect, provide that when the land does become alienable and title is passed it passes free from all debts or incumbrances con-

tracted prior to the time it became alienable. The language is plain and susceptible of but one reasonable construction, viz.: That the allotments could not be incumbered in any manner by any kind of debt or contract until after they became alienable under the treaty. And if it be true that an allottee might convey his lands after they became alienable, and should convey them, in conformity with the acts above, after they became alienable, and the title thus conveyed to the grantee be free of any incumbrance whatever contracted prior to the time such lands were alienable, then we can see no valid reason why such lands, and the title thereto, should not pass by descent to the heirs of the allottee in the same condition.

But counsel for plaintiffs in error contend that: "Under the Atoka Agreement, the surplus lands were alienable for a price to be actually paid, and to include no former indebtedness or obligation." In other words, the purchaser might pay to the allottee the full amount of the purchase price, and could not deduct therefrom any debt or obligation due him from the allottee. The allotment was only exempt from deductions in the purchase price on the part of the purchaser, and was not exempt from debts or obligations due by the allottee to others. It was the evident policy of Congress to protect the allottees against designing and unscrupulous purchasers, who, in anticipation of the purchase of his or her allotment, would induce the allottee to incur indebtedness or obligations to him that would wholly or to a large extent cover the purchase price of the allotment. The exemption is limited to the allottee himself, and to such debts or obligations as may be due the purchaser.

We fully concur with counsel that it was the evident policy of Congress to protect the allottee against designing and unscrupulous purchasers, but cannot agree that such protection was limited to the purchaser alone. If this were the case, then the statutes are wholly unavailing; the policy of both the Congress of the United States and the representatives of the Indian tribes is defeated, and the allottee is virtually without protection. If these statutes mean no more than merely to protect allottees

against designing and unscrupulous *purchasers,* then how easily could they be completely evaded by two or more designing persons acting in collusion, some inducing the allottee to incur indebtedness or obligations to him or them, and the others purchasing the land, with the view of an ultimate division of spoils. We cannot concur in this construction of the law. It was the evident intention of both parties to these agreements to make the allottee absolutely secure in his title to his allotments, and to provide against the subjection of same to the satisfaction of any kind of debt or contract made before the land became alienable.

Counsel for plaintiffs in error cite *Schrimpscher v. Stockton,* 183 U. S. 290, 22 Sup. Ct. 107, 46 L. Ed. 203; *Lykins v. Mc-Grath,* 184 U. S. 169, 22 Sup. Ct. 450, 46 L. Ed. 485; *Western Investment Co. v. Tiger,* 21 Okla. 636, 96 Pac. 602. We have closely examined these authorities and find that they are not applicable to the question presented here. In the case of *Schrimpscher v. Stockton, supra,* the question involved is "whether the heirs of a Wyandotte Indian, to whom, as an incompetent, was allotted a tract of land under the treaty of January 31, 1855, between the United States and the Wyandotte Indians, are bound to institute ejectment against those claiming to hold such land adversely, under a grant from such incompetent, within the period specified by the statute of limitation after the date of the ratification of the treaty of February 23, 1867, removing all restrictions upon sales of lands patented to incompetent Wyandottes which should thereafter be made."

In the case of *Lykins v. McGrath, supra,* under a treaty provision requiring the approval of the Secretary of the Interior, in order to make a conveyance good, an Indian had conveyed some of his land, and had forwarded such conveyance to the Secretary of the Interior for approval. Before such conveyance was reached for examination by the Secretary of the Interior, the Indian grantor died. After his death, the conveyance was approved by the Secretary of the Interior, and the heirs of the deceased allottee brought an action to set aside the deed of con-

veyance, because it had not been approved during the lifetime of the allottee. The court, in an opinion delivered by Mr. Justice Brewer, held this title good as against the heirs.

In the case of *Western Investment Co. v. Tiger,* 21 Okla. 636, 96 Pac. 602, 604, the question decided is "whether an adult full-blood Creek Indian, after five years from the date of approval of the Supplemental Creek Agreement, and without the approval of the Secretary of the Interior, could convey a good title to land which had been allotted to full-blood Creek Indian relatives, and which he had inherited upon the death of such relatives.".

Neither of these cases throws any light on the question whether the land of a deceased allottee, after passing to his heirs, can be sold to satisfy debts of the allottee contracted before such allotment became alienable. It is our opinion that the evident intention of Congress is clearly expressed in the act of July 1, 1902, and is against such policy. And, inasmuch as the petition fails to show wherein plaintiffs were entitled, under the law, to a lien on the allotment, and fails to show wherein such allotment could be sold to satisfy a debt contracted by deceased before his allotment become alienable, it is therefore defective in this feature for failure to state a cause of action.

On the second proposition, "whether the rents and profits, after they have passed to the heirs of deceased, could be subjected to plaintiffs' debt," we get no light from the provisions of the treaty. It clearly provides against incumbering the land itself, but is silent as to the rents and profits derived therefrom. Hence we must go to the general law on real estate for light on this proposition. It is well settled, as a general rule, that rents and profits go with the estate; and, if the title to land vests in heirs, the right to the rents and profits accruing after death of the decedent also vests in the heirs:

"Rents and Profits, Income and Accumulations—a. In General. Where the title and right to possession of the real property of an intestate vests in his heirs at the instant of his death, they are entitled to receive the rents, profits, etc., which accrue after the death of the intestate and before the property is sold, if at all,

by order of the court for the payment of debts, unless the rule is changed by statute, as is the case in some states; but rents which accrued prior to the intestate's death go to the personal representative, although not collected until after the death of the lessor. Even where the decedent has died insolvent or heavily in debt, the heirs are none the less usually held entitled to the rents and profits of the property from his death until the property, by order of the court, is sold for payment of debts. And even after the order for sale has been rendered by the court, the heirs are entitled to the profits accruing till the sale is actually made." (Cyc. vol. 14, p. 114.)

"Crops and Emblements. Crops planted and growing after the death of the intestate generally belong to the heirs." (*Id.*)

"Rents of Mortgaged Land. Rents which accrue upon mortgaged property after the mortgagor's death and before entry go to his heir; nor does a decree of foreclosure *proprio vigore* entitle the mortgagee thereto." (*Id.*)

"As against legatees the heir, if entitled to any part of his ancestor's estate, is entitled to an account of the rents and profits." (*Id.*)

"Rents. The life tenant is entitled to all rents accruing from the property during the continuance of his estate; but where the life tenant takes his estate subject to an existing lease, and dies during the term of the lessee, before any rent becomes due, his administrator cannot recover any part thereof, but the rent for the entire term becomes an incident to the reversion." (Cyc. vol. 16, p. 622; Cyc. vol. 18, tit. Executors and Administrators; Tiedeman on Real Property [3d Ed.] sec. 4, c. 17; Devlin on Real Estate, vol. 2 [3d Ed.] sec. 862a.)

"Rents accruing after the death of the owner of lands are in the nature of chattels real, and descend to his heirs, regardless of a provision in the lease that they are to be paid to his widow; such a provision being invalid as an attempted testamentary devise. *Murray v. Casier*, 23 Ind. App. 600, 53 N. E. 476 [55 N. E. 880]." (Ballard on Real Property, vol. 7, sec. 716.)

"A judgment plaintiff in lawful possession of lands on which his judgment is a lien has not the right to apply the rents and profits to the satisfaction of his judgment as against the owner, who is not a judgment defendant. *Boggs v. Douglass*, 105 Iowa, 344, 75 N. W. 185." (*Id.*)

The foregoing authorities are cited for the purpose merely of bringing before us the universal rule that the right to rents

and profits goes to whomsoever the title goes; that the passing of title passes with it the right to the rents and profits, unless otherwise provided by devise or other instrument of conveyance. And, in the case of decedents, the title passes at the instant of decedent's death, unless otherwise provided by statute.

But, in the case at bar, the heirs were not vested with an absolute title in fee simple to the land. They received such title only as the deceased possessed, which was restricted as to alienation until after the time fixed by the treaty, but which was sufficient to carry with it a right to the rents and profits accruing after the death of the allottee. However, the rule is equally well settled that property of decedents passes to heirs, subject to the debts of deceased. Such debts or claims of creditors, however, must be valid—that is, they must be such debts as he could lawfully incur—and, in order to subject the property of deceased to the payment of such claims, there must be an existing lien, either created by contract with defendant or implied by law.

In the case at bar, the deceased had no power to create a lien against his allotment, and none is implied by law. Hence the claim of plaintiffs was wholly void as against the allotment. By this we do not mean that the debt was void altogether. We do not think it was the intention of the parties to the Atoka Agreement to altogether prohibit the allottee from contracting debts, nor to provide against his personal liability for debts incurred. Neither do we think it was intended to exempt the rents and emblements, after severance from the soil and conversion into personalty, during the limetime of allottee, for the consequent effect of such policy, in many instances, would operate to deprive the allottee of the means of subsistence; but that the object sought to be obtained was to make him absolutely secure in his title to his allotment. If the parties to the treaty intended more than this, such intention is not made apparent in the treaty. It is possible that a contract intended as a lien against the land, or made with the view of an ultimate purchase, or a debt or obligation of any character incurred or entered into with this in view, was void under all circumstances, and wholly uncol-

lectible under any circumstance; but this we merely suggest without deciding, as the record fails to show what were the intentions of the parties in this regard.

But, going back to the original question involved in the second proposition, "whether plaintiffs had an implied lien against the rents and profits after they had been paid over to the heirs," we are of the opinion that, having no right to or interest in the land, nor any lien against same which could have been enforced, even during the lifetime of deceased, plaintiffs have no right to or interest in the rents accruing from same after the title had passed to the heirs. Upon the death of the allottee, the title which he had to the allotment passed at once to the heirs, and with it passed the right to the rents and profits accruing after his death. Such rents and profits belong to the heirs, for the simple reason that the land itself belongs to them. If the plaintiffs ever had any right to enforce thier claim against the personal property of deceased (and we are not saying they had none), they were barred of such right of enforcement for failure to present and file their claims with the executor of the estate before the administration was closed, and within the time specified by law, so that such claims might be classified, "allowed, and prorated," as provided by the law in force at the time. Section 98, Mansf. Dig., St. of Ark. subd. 5 (Ind. T. Ann. St. 1899, sec. 155), reads:

"And all demands not exhibited to the executor or administrator, as required by this act, before the end of two years from the granting of letters, shall be forever barred."

These statutes are construed in the case of *Bennett v. Dawson*, 18 Ark. 334; *Connelly v. Weatherly,* 33 Ark. 658. Also, in *Huneke v. Dodd,* 7 N. M. 5, 32 Pac. 45, it is held:

"An equitable proceeding to enforce the collection of decedent's debts cannot be maintained against his heirs until the creditor has exhausted the statutory remedy given him in such cases."

The record shows there was an administration, the validity of which is not denied by plaintiffs. It shows also that plaintiffs' claim was barred by the two years limitation of statute

within which claims against an estate must be presented.  The petition fails to show whether the rents in controversy accrued before or after the death of the allottee, or whether partly before and partly after, or whether the alleged collected rents were derived from proceeds or emblements to which the heirs were not entitled; so, whatever the facts may have been, plaintiffs were barred of their right to such portion of the rents as accrued before the death of allottee, if there were any of such portion, because of their failure to present their claim to the executor within the time prescribed by law, and were barred of all right against such portion of the rents as accrued after death, because, having no right to the land, nor any enforceable lien against same, they had no right to the rents and profits which passed with the title to the land.  Hence we must hold that the petition fails to state a cause of action for the recovery of the rents and profits; and, failing to show any right of plaintiffs to the land of deceased, or to the rents and profits accruing therefrom, and this being all the property against which plaintiffs sought to enforce their claim, we must hold that the demurrer to the petition was properly sustained.

In addition to this, it is alleged in the petition that in October, 1907, the defendant Wm. Ansley, as father and heir of deceased, in an application for a life estate in the allotments of deceased, obtained an order, at the hearing of said application, from the United States Court at McAlester, decreeing to him a life estate in such allotments, and requiring the executor to surrender the possession of same to the father; and that in compliance with said order the executor surrendered possession of the allotments, together with the collected rents then in his possession, to him.  At this hearing the rights of the father, as heir of deceased, were determined, and, there being no complaint of irregularity, no appeal having been taken from such judgment, nor any application made within the statutory time for its modification or vacation, such decree is final.

For the foregoing reasons, the judgment of the lower court is affirmed.

By the Court:  It is so ordered.