NEILSON v. ALBERTY.

No. 2020.    Opinion Filed January 7, 1913.

(129 Pac. 847.)

1. INDIANS—Indian Lands—Osage Allotment—Alienation—Restriction. By the fourth paragraph of section 2 of Act Cong. June 28, 1906, c. 3572, 34 St. at L. 539, known as the Osage Allotment Act, all lands allotted to the members of the Osage Tribe were made inalienable for a period of 25 years from date of selection.

2. **SAME — Certificates of Competency — Effect.** Under the provisions of paragraph 7 of section 2 of said act (Act June 28, 1906, c. 3572, 34 St. at L. 540), adult members of the Osage Tribe, to whom certificates of competency were issued by the Secretary of the Interior, could sell and convey, manage, control, and dispose of their surplus allotted lands, but could not sell the oil, gas, coal, or other mineral covered by said lands.

3. **SAME—Liens.** Said last above provision of the act applies only to voluntary conveyances by the allottee, such as were effected by the personal will of the owner, and not to the creation of liens or transmissions of title by operation of law, unless arising out of the further provision, making the surplus lands subject to taxation.

4. **SAME—Surplus Lands—Judgment Lien.** A judgment was rendered in the United States Court in the Indian Territory against an Osage Indian on the 1st day of December, 1903. July 30, 1909, the Secretary of the Interior approved a patent to said Indian's surplus allotment of Osage Indian lands, and on the 30th day of October following issued to said allottee a certificate of competency as authorized by Osage Allotment Act June 28, 1906, c. 3572, 34 St. at L. 539. On the 29th day of January, 1910, a transcript of said Indian Territory judgment was filed with the clerk of the district court of Osage county, in which county the judgment debtor's surplus lands were situated. Held, the the issuance of the certificate of competency did not remove the restrictions on alienation so as to subject said lands to a judgment lien.

5. **SAME—"Manage"—"Control"—To "Dispose of."** Osage Allotment Act June 28, 1906, c. 3572, sec. 2, par. 7, 34 St. at L. 540, authorizes the Secretary of the Interior to issue certificates of competency to allottees who shall then have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States. Held, that the word "manage," as so used, means to have under control, under direction, to conduct, to guide, to administer, to treat, to handle, while "control" means to exercise restraining or governing influence over, to check, to counteract, to restrain, to regulate, to govern, to overpower, and "to dispose of" means to exercise finally one's power of control over, to pass over into the control of some one else, as by selling, to alienate, to part with, relinquish or get rid of, and such words did not contemplate either a sale of underlying mineral or of the surplus lands by a judgment lien.

(Syllabus by Sharp, C.)

*Error from District Court, Osage County;*
*John J. Shea, Judge.*

Action by Cynthia Alberty against F. A. Neilson. Judgment for plaintiff, and defendant brings error. Affirmed.

*Grinstead, Mason & Scott,* for plaintiff in error.

*R. B. Boone* and *Leahy & MacDonald,* for defendant in error.

Opinion by SHARP, C. February 17, 1910, Cynthia Al-
berty filed her petition in the district court of Osage county, al-
leging that she was a citizen of the Osage Tribe of Indians, and
the owner of an allotment of land situated in the Osage reserva-
tion, consisting of 160 acres homestead and 498.28 acres surplus
allotment, which lands were allotted to her under the provisions
of an Act of Congress of June 28, 1906, commonly known as the
Osage Allotment Act; that deeds or patents therefor had been
duly issued and recorded; that, pursuant to a provision of said
act, the Secretary of the Interior on the 8th day of October,
1909, issued to said plaintiff a certificate of competency, by virtue
of which she was authorized to sell, dispose, or incumber her
surplus allotted lands; that on the 1st day of December, 1903,
in an action wherein said F. A. Neilson was plaintiff and said
Cynthia Alberty was defendant, brought in the United States
Court for the Northern District of the Indian Territory, at Clare-
more, said plaintiff recovered a judgment against said defendant
for the sum of $1,139.97. Thereafter, and on the 29th day of
January, 1910, the plaintiff in said action caused a certified copy
of said judgment to be entered upon the judgment docket in the
district court of Osage county, and that said judgment was at
the time of the institution of the latter action unsatisfied. The
petition further charged that said judgment, being of record, con-
stituted a cloud upon the title to her surplus lands, and was a
bar to her ability to dispose of or incumber them; that under
the law then in force said lands were not liable to the satisfaction
of any debt contracted prior to the issuance of the final patent in
fee (the dates of the various acts being set forth in the petition);
and that said judgment did not constitute a lien upon said lands,
but that, notwithstanding said fact, it appeared as a *prima facie*
lien, and operated to her great damage and detriment, and would
so continue to do. Plaintiff asked that the court decree that said
judgment was not a lien upon her surplus land, and that said
judgment should not stand as a *prima facie* cloud upon her title
to her surplus allotment. Defendant's demurrer to the petition
being overruled, and defendant electing to stand on his demurrer,

judgment was rendered for plaintiff according to the prayer of her petition.

A determination of the case involves a consideration of various sections of the act of Congress authorizing the division of the land of the Osage Indians of Oklahoma Territory, approved June 28, 1906. This act authorizes first, second, and third selections or allotments of 160 acres each, with a provision that the allottee may share in the remaining unallotted lands. It provides in the fourth paragraph of section 2 that of such selections the allottee shall be permitted to designate which shall be a homestead, and that his certificate of allotment and deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable until otherwise provided by act of Congress. The remaining selections shall be known as surplus lands, and shall be inalienable for 25 years, except as thereinafter provided. In the seventh paragraph of said section 2 it is provided that the Secretary of the Interior in his discretion, at and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of the act, except his homestead, which shall remain inalienable and nontaxable for the period of 25 years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business, and caring for his or her own individual affairs, provided, that, upon the issuance of such certificate of competency, the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as therein provided, shall have the right to manage, control and dispose of his or her lands the same as any citizen of the United States, provided, that the surplus lands shall be nontaxable for the period of three years from the approval of said act, except where certificates of competency are issued, or in case of the death of the allottee, unless otherwise provided by Congress.

Further inhibitions are contained in said section against the sale of oil, gas, coal, or other minerals covered by said lands,

which are reserved to the use of the tribe for a period of 25 years, and the royalties on which are to be paid to said tribe as thereinafter provided. It will thus be seen that the homestead allotment shall be and remain inalienable and nontaxable for a period of 25 years, or during the life of the homestead allottee, while the surplus lands are made inalienable for 25 years except as in said act provided; the provision referred to being the issuance to the allottee of a certificate of competency. In other words, that without the issuance of a certificate of competency no alienation, voluntary or involuntary, could be made of said lands, at least during the lifetime of the allottee; that the lands were not subject to either alienation or incumbrance of any kind or in any form. Any authority, therefore, for the transition of title, the creation of a lien or incumbrance, or any act of commission or omission that would in any wise affect the title of the living allottee, must be found in the seventh paragraph of said section, authorizing the Secretary of the Interior to issue certificates of competency to adult members of the tribe. This certificate, it is provided, shall be issued at the request and upon the petition of such member, and if, upon investigation, consideration, and examination of said request, such member shall be found to be fully competent and capable of transacting his or her own business, and caring for his or her own individual affairs, the Secretary may in his discretion issue a certificate authorizing the allottee to sell and convey any of his surplus lands; that upon the issuance of such certificate, by express enactment, the surplus lands became subject to taxation, and such member was given the right to manage, control, and dispose of his surplus lands the same as any citizen of the United States.

Does, therefore, this statute contemplate the attaching of a judgment lien to the surplus lands of such citizen upon the issuance of such certificate? If not, the judgment of the court below should be affirmed. Obviously the first provision authorizing a member of the tribe to whom a certificate of competency has been issued to sell and convey her surplus lands cannot be construed to mean that said lands may be subjected to a lien created by operation of law. The latter clause, which provides that, upon

the issuance of the certificate of competency, a member shall have the right to manage, control, and dispose of her lands the same as any citizen of the United States, it is contended by plaintiff in error, placed the defendant in error upon exactly the same footing in respect to her surplus allotment as any United States citizen owning land. We are unable to agree with this contention, and submit that the words employed cannot be extended by any known rule of construction so as to authorize the attaching to the lands of a lien created by statute, not the result of the voluntary act of the allottee. It is a familiar rule in the interpretation of statutes that words in common use are to be construed in their natural, plain, and ordinary signification. *Regents of University v. Board of Education,* 20 Okla. 809, 95 Pac. 429. In *Board of Lake County Commissioners v. Rollins,* 130 U. S. 662, 9 Sup. Ct. 651, 32 L. Ed. 1061, the rule of construction mentioned was expressed by the court in the following language:

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the Legislature have the right to add to it or take from it. *Newell v. People,* 7 N. Y. 97; *Hills v. Chicago,* 60 Ill. 86; *Denn v. Reid,* 35 U. S. (10 Pet.) 524, 9 L. Ed. 519; *Leonard v. Wiseman,* 31 Md. 204; *People v. Potter,* 47 N. Y. 375; Cooley, Const. Lim. p. 57; Story, Const. sec. 400; *Beardstown v. Virginia,* 76 Ill. 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. *United States v. Fisher,* 6 U. S. (2 Cranch) 358, 399, 2 L. Ed. 304, 317; *Doggett v. Florida R. Co.,* 99 U. S. 72, 25 L. Ed. 301."

"Manage" means to have under control, under direction, to conduct, to guide, to administer, to treat, to handle; while "control" means to exercise restraining or governing influence over, to check, to counteract, to restrain, to regulate, to govern, to overpower. Webster's International Dictionary. The words "manage" and "control" are synonymous. *Youngworth v. Jewell,*

15 Nev. 45; *Ure v. Ure,* 185 Ill. 216, 56 N. E. 1087; *Gray v. Parke,* 162 Mass. 582, 39 N. E. 191. To manage, or to control, does not confer upon one thus invested with authority the right to sell. *Blanton v. Mayes,* 58 Tex. 422; *Anderson v. Stockdale,* 62 Tex. 54; *Porter v. Thomas,* 23 Ga. 467; *Wolffe v. Loeb,* 98 Ala. 426, 13 South. 744; *Randall v. Josselyn,* 59 Vt. 567, 10 Atl. 577; *Golinsky v. Allison,* 114 Cal. 458, 46 Pac. 295; *Goad v. Montgomery,* 119 Cal. 552, 51 Pac. 681, 63 Am. St. Rep. 145; *Duncan v. Hartman,* 143 Pa. 595, 22 Atl. 1099, 24 Am. St. Rep. 570. Are, then, the remaining words, "And such member * * * shall have the right to dispose of," sufficiently comprehensive to warrant the construction contended for? "To dispose of" means to exercise finally one's power of control over; to pass over into the control of some one else, as by selling; to alienate, to part with, to relinquish, to get rid of. Webster's International Dictionary; *Stark et al. v. Duvall et al.,* 7 Okla. 213, 54 Pac. 453; *Jenckes v. Court of Probate of Smithfield,* 2 R. I. 255; *Harty v. Doyle,* 49 Hun. 410, 3 N. Y. Supp. 574; *Burbank v. Rockingham Mut. Fire Ins. Co.,* 24 N. H. 550, 57 Am. Dec. 300; *Masters v. Madison County Mut. Ins. Co.,* 11 Barb. (N. Y.) 624; *Gould v. Head* (C. C.) 41 Fed. 240. It is an active, not a mere passive, quality, and implies volition, the act of forming a purpose and executing the will. Such were the powers, and none other, that were conferred. They are not the legal equivalent to a removal of restrictions as used in contemporaneous Indian legislation as we shall see.

Counsel for plaintiff in error cite in support of their contention *Goudy v. Meath, Assessor,* 38 Wash. 126, 80 Pac. 295, affirmed on appeal to the United States Supreme Court, and reported in 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130, and *Beall et al. v. Graham,* 75 Kan. 98, 88 Pac. 543. In the Washington case a patent to an Indian was made subject to a treaty which provided that the lands should not be alienated, and should be exempt from levy, sale, or forfeiture, and that such restrictions should remain in force until removed by the state Legislature with the consent of Congress. Afterwards Congress provided by Act March 3, 1893, c. 209, 27 St. at L. 612, that In-

dian allottees should not have the power of alienation for the period of ten years after the passage of the act, and the state Legislature by Act March 22, 1890 (Laws 1889-90 [Wash.] p. 499), provided that Indians holding lands by virtue of treaties between them and the United States should have the power to lease, incumber, grant, and alien the same, and that all restrictions in reference thereto were thereby removed. It was held that the provision that lands were not subject to levy, sale, or forfeiture was removed, so that, after the expiration of the ten-year period, the lands were subject to taxation. It will be noticed that section 1 of the act of the state Legislature, in addition to conferring power to lease, incumber, grant, and alien any lands taken in severalty, provided further: "And all restrictions in reference thereto are hereby removed." It was held that, after the expiration of the ten-year period, restrictions upon the alienation and sale of lands were removed, and that the land was thereupon subject to taxation. On hearing in the Supreme Court of the United States the authority of Congress to grant the power of voluntary sale and to withhold the land from taxation or forced alienation was conceded by the court, who held, further, that the language employed was sufficiently comprehensive to remove all restrictions by alienation so as to subject the land not only to voluntary but to involuntary alienation. In the Kansas case of *Beall v. Graham, supra,* it was held that a judgment of the district court against an adult Kickapoo Indian was not a lien upon his inherited lands situated in the county where such judgment was rendered.

Act April 21, 1904, c. 1402, 33 St. at L. 204, removing restrictions on the alienation of certain lands theretofore allotted to members of the Five Civilized Tribes of Indians, was in the following language:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and the restrictions upon the alienation of all other allottees of said tribes except minors and except as to homesteads, may with the approval of the Secretary of the Interior be removed," etc.

Act May 27, 1908, c. 199, 35 St. at L. 312, removing re-
strictions from part of the lands of allottees of the Five Civilized
Tribes, used equally as comprehensive language. It is difficult
to conceive how broader language could have been used. Here
the lands in the first place were made inalienable for 25 years;
but upon certain conditions the Secretary of the Interior was au-
thorized to do what? To remove all restrictions upon alienation?
No. Simply to issue a certificate of competency whereby an adult
member of the tribe might have the right to manage, control, and
dispose of his surplus lands, except as otherwise therein pro-
vided. Section 7 of the act required that the leases given by the
allottee should be subject to the approval of the Secretary of
the Interior. This restriction was one of those removed, as was
that of the right to sell as we have already seen. A case to
our minds which fully sustains our contention is that of *Love v.
Pamplin* (C. C.) 21 Fed. 755, the opinion being by Justice
Mathews at circuit, and concurred in by Hammond, J. There
the language of a part of article 4 of the Chickasaw Treaty of
1834 (7 St. at L. 450) provided for the allotment of lands which
should not be permitted to be sold, leased, or disposed of unless
it appeared by the certificate of at least two of seven persons
named therein that the party owning or claiming the same was
capable to manage and take care of his or her affairs. The con-
test arose between the heirs at law of the allottee and the pur-
chasers through mesne conveyance of certain judgment creditors,
who had procured the sale of the allotted lands in the state courts
of the state of Tennessee. It was admitted that the court pro-
ceedings were in all respects regular and in conformity with the
laws of Tennessee. It was said by the court in the opinion:

"It becomes a question, therefore, in the first instance of the
true meaning of the treaty, and, looking at its provisions in the
light of the circumstances, and of the natural and obvious mean-
ing of the language in which they are expressed, and of the con-
text, it appears to be clear that the intention of the instrument
limits the clauses restrictive of alienation, as to the lands re-
served to individuals, to cases of voluntary conveyances. The
language of the prohibition is that the reservations shall not be
'sold, leased, or disposed of,' and, although the words last used,

'disposed of,' might seem to embrace other dispositions than those of sale and lease, yet they cannot upon the principle *noscitur a sociis* be extended so as to include any other than those of a character like those specially named; that is, of a voluntary nature, effected by the personal will of the possessor."

There the words employed in the treaty were "sold, leased, or disposed of," here, "and such member, except as herein provided, shall have the right to manage, control, and dispose of," thus conclusively establishing that it only intended conveyances or incumbrances of a voluntary nature. The judgment obtained against defendant in error was rendered on the 1st day of December, 1903, or about five and one-half years before the issuance of the surplus patent, and over three years before the conclusion of the allotment treaty. That it was the purpose of the general government in the allotment of these lands to protect the individual allottee, in view of the long course of dealing between it and the various Indian tribes, cannot be considered an open question, and while the original Osage treaty contained no express provision exempting allotted lands for debts and obligations contracted by its members, created prior to the issuance of patent, it sufficiently provides that it shall be inalienable except by the voluntary act of the allottee. *Western Investment Co. v. Kistler,* 22 Okla. 222, 97 Pac. 588; *In re Davis' Estate,* 32 Okla. 209, 122 Pac. 547; *Redwine et al. v. Ansley et al.,* 32 Okla. 317, 122 Pac. 679; *In re Washington's Estate, post,* 128 Pac. 1079. When we stop to consider that in all its dealings with the members of the Five Civilized Tribes the government has thrown around those highly civilized and enlightened people a protection such as that named, and to then conclude that it was the intention of Congress to subject the lands of the Osages, a tribe yet maintaining their own tribal form of government, to an enforced alienation for the payment of debts, is to accuse Congress of a willful and gross neglect of duty toward these dependent people, who, while not financially dependent, are in a governmental sense helpless, and who look to the general government for protection of their landed estates. Construing the act as we have done, no such hardship and discrimination in legislation follows.

While we entertain no doubt on the conclusions reached, yet, if a doubt existed, it is one that under the uniform holdings of the Supreme Court of the United States for more than 100 years must be resolved in favor of the defendant in error. *Tiger v. Western Investment Co.*, 221 U. S. 298, 31 Sup. Ct. 578, 55 L. Ed. 738; *Choate v. Trapp*, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; *United States v. Celestine*, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195. We do not believe the statute authorizing the issuance of certificates of competency can be given greater effect than the words, used by their clear meaning, import. There is a material distinction between the removal of restrictions on alienation of allotted lands, and the issuance of a certificate of competency, predicated upon the applicant being competent and capable of transacting her own business and caring for her own affairs; and this is particularly true when the effect of the issuance of the certificate is defined in the act itself. Congress acted within the scope of its reserved power in the passage of the Allotment Act. It was for the Osage Indians and their benefit and advancement that it undertook to legislate, and not for their creditors. The latter would be no worse off than at the time of the creation of the obligation upon which the judgment was obtained.

The judgment of the trial court should for the reasons given be affirmed.

By the Court: It is so ordered.