## *In re* FRENCH'S ESTATE.

## CARSON v. FRENCH *et al.*

No. 4007.   Opinion Filed March 16, 1915.

(147 Pac. 319.)

1.  INDIANS—Surplus Allotment—Judicial Sale. Under section 14 of the Cherokee Agreement of July 1, 1902, ratified August 7, 1902 (32 Stat. at L. 716, c. 1375), the surplus allotment of a Cherokee freedman could not be sold on petition of a judgment creditor, filed in the county court having jurisdiction of the administration proceedings on the estate of the deceased allottee, in satisfaction of said judgment, where the indebtedness, which merged into the judgment, was not secured by said allotted lands, and was created by the allottee during the five-year restricted period named in said section, though after the passage of the act of April 21, 1904 (33 Stat. at L. 189, c. 1402.)

2.  INDIANS—Allotments—Sale to Satisfy Debts—Operation of Statute. That part of section 14 of the act of July 1, 1902, providing that all "lands allotted to   *   *   *   citizens shall not in any manner   *   *   *   be incumbered, taken, or sold to secure or satisfy any debt or obligation,   *   *   *   before the expiration of five years from the date of the ratification of this act," is unaffected by the passage of the act of April 21, 1904. The foregoing provision of the former act is in effect an exemption law, while the latter act only purports to remove restriction on alienation.

3.  INDIANS—Allotments—Alienation—Operation of Statute. Section 1 of the act of April 21, 1904 (33 Stat. at L. 189, c. 1402), providing that "*   *   *   all · restrictions upon the alienation" of lands "of all   *   *   *   allottees" of either of the Five Civilized Tribes of Indians who are not of Indian blood, "except minors" are "except as to homesteads," hereby "removed, *   *   *"   should be construed to authorize voluntary alienations only, as distinguished from involuntary or enforced incumbrances, sales, or takings, such as are referred to in the first part of section 14 of the above act.

(Syllabus by the Court.)

*Error from District Court, Nowata County;*

*T. L. Brown, Judge.*

A petition for the sale of a part of the allotment of David French, deceased, was filed in county court by Thomas Carson, deceased. Protests of Wash French, administrator of the estate of David French, deceased, and others, against the granting of the order of sale, were sustained by both the county court and the district court on appeal, and petitioner brings error. Affirmed.

*J. E. Bennett* and *Glass & Weaver,* for plaintiff in error.

*W. D. Humphrey,* for defendants in error.

SHARP, J.   The one question necessary to a determination of the questions presented by this appeal is: Can the surplus allotment of a Cherokee freedman be subjected to a judicial sale for a debt contracted by the allottee before the expiration of five years from the date of the ratification of the Cherokee Agreement (32 Stat. at L. 716), and after the passage of the Act of Congress of April 21, 1904 (33 Stat. at L. 189).

On or about the 20th day of September, 1907, David French died, leaving surviving him his two adult sons, Wash and Eli. These sons thereafter sold to the protestants, J. A. Wettack and J. W. Uncapher, the lands inherited by them from the estate of their father. Upon petition for the sale of said lands being filed in the county court by the plaintiff in error herein, both the administrator and the purchasers filed their respective protests against the granting of the order of sale, which was sustained both by the county court and by the district court on appeal. The lands being a part of the allotment of said David French, deceased, during life a Cherokee freedman, their aliena-tion is controlled by the provisions of the Cherokee Agreement, approved July 1, 1902, and ratified by the Cherokee Nation August 7th, thereafter. Section 14 of said act is as follows:

"Lands allotted to * * * citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act."

On the part of plaintiff in error, it is insisted that David French, being an adult allottee of the Cherokee Nation, not of Indian blood, and the land sought to be sold not involving the homestead, all restrictions thereon were removed by the act of April 21, 1904. We do not think so, and for two reasons. The first paragraph of section 16 of the Creek Supplemental Agreement (Act June 30, 1902, c. 1323, 32 Stat. 503) is very siimlar to section 14 of the Cherokee Agreement. That part of section 16, Creek Agreement, referred to, is as follows:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement; except with the approval of the Secretary of the Interior."

Section 14, Cherokee Agreement, we have already set out. It will be noticed that the former, or Cherokee Agreement, prohibits alienation before the expiration of five years from the date of the ratification of this act, while the latter, or Creek Agreement, prohibits alienation before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior.

Construing the provision of the Creek Agreement, this court, in *Western Investment Co. v. Kistler*, 22 Okla. 222, 97 Pac. 588, called attention that, by the first clause of section 16, Congress intended to protect the lands allotted to citizens of the Creek Nation against involuntary incumbrance or forced sales of any kind to secure or satisfy any debt or obligation for a period of five years, unless the Secretary of the Interior approved such in-

voluntary incumbrance, sale, or taking. It was there said that this part of the provision was not a restriction upon the allottee or his heirs, but was in effect an exemption law to protect his surplus allotted lands from forced sale for the period of five years to satisfy any debt or obligation incurred while the exemption was in operation. That, by the first paragraph or subdivision of section 16, reference was had to forced incumbrance, sales, or takings to secure or satisfy any debt, and the second to voluntary alienation by the allottee or his heirs. The opinion further holds that the removal of restrictions upon voluntary alienation by the allottee or his heirs (in that case by act of the Secretary of the Interior) did not subject the land to the involuntary incumbrances, sales, or takings contemplated by the first clause. What was there said with regard to the Creek Treaty may with equal force be said of section 14 of the Cherokee Agreement. They are so near alike. In fact, the rule above announced was applied in *French, Adm'r, v. Washington et al.*, 36 Okla. 559, 128 Pac. 1079, where it was held that the allotment of a citizen of the Cherokee Nation or tribe of Indians was not subject to involuntary sale for the payment of debts contracted by the allottee before the expiration of five years after the date of ratification of the Cherokee Agreement of July 1, 1902. In that case it was observed by the court:

"In so far as the question here involved is concerned, this provision (section 16) is identical in meaning with section 14 of the Cherokee Agreement, and what the court said in the Kistler Case is entirely applicable and controlling in this case."

In the Kistler case the allottee was a Creek Indian by blood, in the Washington Case a full-blood Delaware citizen of the Cherokee Nation, while in the instant case the allottee is a Cherokee freedman. Being a freedman, it is contended that the act of April 21, 1904, removing all restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians, not of Indian blood, except minors, and

except as to homesteads, in effect worked a repeal of section 14, and that although theretofore the lands were not subject to enforced alienation for a debt contracted while the restrictions were in force, yet the restrictions having been removed by the latter act, and the debt upon which the judgment was based having been incurred subsequent thereto, the surplus allotment of David French, deceased, was liable as though it was the property of another than an allottee of the Five Civilized Tribes. However, it must be borne in mind, according to the rule announced in the Kistler case, and followed in the Washington case, that the former part of section 16 of the Creek Agreement was not a restriction upon the allottee or his heirs, but was in effect an exemption law, to protect the allottee's surplus lands from forced sale for the period of five years, to satisfy a debt or obligation incurred while the exemption was in operation. The act of April 21, 1904, only removed restrictions upon alienation of certain lands of allottees of the class therein named, and in no wise attempted to affect or impair the rights of allottees to the exemptions named in the first paragraph of section 14 of the Cherokee Agreement. It simply shortened the period at which certain classes of allottees might voluntarily alienate their surplus allotted lands.

An additional reason that supports our conclusion is this: The act of April 21, 1904, should be construed so as to include voluntary alienations only. We cannot believe that by the passage of the latter act, within less than two years of both the passage and ratification of the Cherokee Agreement, in view of the well-known policy of Congress in its dealings with Indian tribes, the intention was to permit the enforced sale of allotted lands, even though it gave its consent to their alienation. To permit the allottee voluntarily to dispose of a portion of his surplus allotment is one thing; to permit his creditors by process of law to take from him the title thereto, in satisfaction of an antecedent indebtedness, is another and quite different

proposition. The act of April 21, 1904, permitted alienation (*Thraves et al. v. Greenlees,* 42 Okla. 764, 142 Pac. 1021), and authorized the giving of a mortgage (*Landrum v. Graham,* 22 Okla. 458, 98 Pac. 432), thus enabling the allottee to borrow money with which to improve his homestead or surplus lands. It gave him a means by which he could better his opportunity in life or, if desired, sell a part of his allotted lands. It furnished him a limited basis of credit. This, we believe, was the true intention of Congress, for in the enactment of this statute Congress acted in behalf of and as guardian of a dependent people, and not in the interest of their creditors. Such is the fixed policy of the federal government in legislating for its wards, as recognized by many decisions of the highest courts. *Mullen v. Simmons et al.,* 234 U. S. 192, 34 Sup. Ct. 857, 58 L. Ed. 1274; *Starr v. Long Jim,* 227 U. S. 613, 33 Sup. Ct. 358, 57 L. Ed. 670, 675. *In re Davis' Estate,* 32 Okla. 209, 122 Pac. 545, we held that the allotted lands of a deceased Choctaw freedman were not liable for any debt or obligation of any character, contracted prior to the time at which such allotment was alienable, and that the same could not be ordered sold by the county court for such purpose.. In *Redwine et al. v. Ansley et al.,* 32 Okla. 317, 122 Pac. 679, construing section 29 of the act of June 28, 1898 (30 Stat. at L. 495, c. 517), and section 15 of the act of July 1, 1902 (32 Stat. at L. 641, c. 1362), it was held that, when the allotted land became alienable and title passed, it passed free from any debts or incumbrances contracted prior to the time it became alienable; that the allotments could not be incumbered in any manner by any kind of debt or contract, until after they became alienable under the treaty; and that it was evidently the intention of both parties to the agreement to make the allottee absolutely secure in his title to the allotment, and to provide against the subjection of the same to the satisfaction of any kind of debt or contract made before the land became alienable. In *Neilson v. Alberty,* 36 Okla. 490, 129 Pac. 847, it was said that under the provisions of paragraph

In re French's Estate—Carson v. French, et al.

7 of section 2 of the act of June 28, 1906 (34 Stat. at L. 540, c. 3572), adult members of the Osage Tribe, to whom certificates of competency were issued by the Secretary of the Interior, could sell and convey, mortgage and dispose of, their surplus allotted lands (excepting oil, gas, coal, or other minerals covered by said lands), but that the foregoing provisions of the act applied only to voluntary conveyances by the allottee, such as were effected by the personal will of the owner, and not to the creation of liens or transmissions of title by operation of law. See, also, *Love v. Pamplin* (C. C.) 21 Fed. 755, opinion by Justice Matthews, at Circuit, concurred in by Hammond, J.

Our views find support in Bledsoe's Indian Land Laws, where, at section 70b (2d Ed.) it is said that section 14 is in the nature of an exemption rather than a restriction upon alienation, that the provision is one designed to protect members of the tribe against their own improvidences, and directs attention to the fact that similar provisions have received liberal interpretation to that end.

The indebtedness upon which the judgment was predicated having been contracted within the five-year period named in section 14 of the allotment act of July 1, 1902, though after the passage of the act of April 21, 1904, the lands allotted to the judgment debtor could not be sold in satisfaction of a judgment obtained on said indebtedness. The other questions presented upon the record, in view of our conclusions, need not be considered.

The judgment of the trial court is affirmed.

All the Justices concur.