WORK, SECRETARY OF THE INTERIOR, *v.* UNITED STATES EX REL. LYNN, GUARDIAN OF LASLEY, AN INCOMPETENT OSAGE INDIAN ALLOTTEE.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 17. Argued January 16, 17, 1924.—Decided November 17, 1924.

1. Under § 4 of the Act of March 3, 1921, c. 120, 41 Stat. 1249, regulating quarterly payments by the Secretary of the Interior to the members of the Osage Tribe of their income from interest on trust funds, bonuses, and royalties, the income of an adult member who has not received a certificate of competency and who has been placed under guardianship, as an incompetent person, by an Oklahoma county court, must be paid to such legal guardian, not to exceed the amount of $1,000 quarterly. P. 168.

2. As the duty to make such payments is plain, notwithstanding the loose framing of the statute, payment may be required of the Secretary by mandamus. P. 171.

3. But the excess, if any, of such incompetent's income over $1,000, is not to be paid to the guardian, but to be invested in the securities, or deposited at interest in the banks, prescribed by the section, for the benefit of the incompetent, under rules and regulations prescribed by the Secretary. P. 170.

4. The clause of the section requiring all " quarterly payments to legal guardians " and adults not having certificates of competency " to be paid under the supervision of the Superintendent of the Osage Agency," refers to a supervision designed to effectuate the payments specifically directed, but does not authorize the Secretary to impose a restriction as to how the money which he is directed to pay to a guardian shall be invested or deposited by the latter. P. 169.

5. Under § 3 of the Act of April 18, 1912, however, (c. 83, 37 Stat. 86), the Secretary may invoke action by the county court in respect of any matter affecting the Indian ward's estate, and is entitled to full consideration of the matter thus presented. *Id.*

52 App. D. C. 155; 285 Fed. 889, reversed.

ERROR to a judgment of the Court of Appeals of the District of Columbia which sustained the Supreme Court of the District in awarding a writ of mandamus.

*Mr. C. Edward Wright,* with whom *Mr. John H. Edwards,* was on the brief, for plaintiff in error.

*Mr. Conrad H. Syme,* with whom *Mr. James W. Beller* and *Mr. D. E. Johnson* were on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a petition, in the Supreme Court of the District of Columbia, for a writ of mandamus to compel the Secretary of the Interior to pay to the relator as guardian of Rosa Lasley, an incompetent Osage Indian, her share of certain tribal income. The court sustained a demurrer

to the answer, and on the defendant's declining to plead
further, a judgment was entered awarding the writ. The
judgment was affirmed by the Court of Appeals, 52 App.
D. C. 155; 285 Fed. 889, and the case is here on writ of
error.

Rosa Lasley is an adult member of the Osage Tribe,
enrolled as such, and entitled to share in the tribal in-
come. She never was given a certificate of competency
by the Secretary of the Interior. In 1919 the county
court of Osage County, Oklahoma, adjudged her an in-
competent person and appointed the relator her guardian.
Up to the end of September, 1921, her share of the tribal
income was regularly paid to the guardian; and he duly
accounted therefor to the county court. But the defen-
dant refused to make further payments unless the guard-
ian would agree to invest the moneys in United States
bonds or Oklahoma state, county or school bonds, or to
place the same at interest on time deposits in Oklahoma
banks. This the guardian declined to do because he be-
lieved the power to direct and control the investment of
the moneys, after they were paid to him, was in the
county court. Early in 1922, when the petition was filed,
the income due to the ward and standing to her credit in
the public accounts with the Osages was approximately
$9,000, and further sums were becoming due and being
so credited.

In his answer the defendant justified his refusal to
pay on the ground that in administering the Act of March
3, 1921, c. 120, § 4, 41 Stat. 1249, relating to such pay-
ments, he had construed it as meaning that in the case
of an incompetent adult having a legal guardian " all
income available, including any amount in excess of
$1,000 quarterly, should be paid to the guardian ", but
that the payment should, or might in the defendant's
discretion, be made subject to a restriction that the

moneys be invested or deposited as already indicated; that he had given effect to that construction by adopting and promulgating regulations embodying such a restriction, and that the guardian had declined to assent to it.

Whether the construction so put on the act is right is the question for decision. Other prior and related acts have a bearing on the question.

The Osage Tribe was settled many years ago on a reservation covering all or much of what is now Osage County, Oklahoma. See c. 310, 17 Stat. 228.

By an Act of June 28, 1906, c. 3572, 34 Stat. 539, Congress adopted a plan for distributing the lands and funds of the tribe among its members. Most of the lands were to be allotted in severalty, partly as homesteads and partly as surplus land; and the remaining lands, including some town lots and buildings, were to be sold for the benefit of the tribe. The oil, gas, coal and other minerals were to be reserved to the tribe for twenty-five years and leased during that period on royalties. Certain tribal funds were to be held in trust by the United States for twenty-five years and then paid to the members. In the meantime, and as soon as practicable, these funds were to be segregated and placed to the credit of the individual members on the basis of a *pro rata* division. The amounts credited were to draw interest and the interest was to be paid to the members quarterly. The interest due to minors was to be paid to the parents, but where the Commissioner of Indian Affairs became satisfied that the parents were misusing or squandering the money further payment might be withheld, and where the parents were deceased payment was to be made to a legal guardian. The proceeds from the lands, town lots and buildings that were to be sold, together with the royalties from oil, gas, coal and other mineral leases and any money received from grazing privileges, were to be placed in the Treasury of the United States to the credit of the individual mem-

bers and, subject to deductions not material here, were to be paid to them in the manner and at the times the interest on the trust funds was to be paid. For a period of twenty-five years all members were to be regarded as without capacity to sell or dispose of the lands allotted to them, save where adults were given certificates of competency by the Secretary of the Interior on his finding, after investigation, that they were fully capable of caring for their own affairs. On the issue of such a certificate the lands of the member other than the homestead were to be taxable, and he was to have the right to manage, control and dispose of all excepting the homestead.

Some changes in the act were effected by a joint resolution of February 27, 1909, 35 Stat. 1167, and an Act of March 3 of the same year, c. 256, 35 Stat. 778, but they are without present bearing.

By an Act of April 18, 1912, c. 83, 37 Stat. 86, Congress altered the first act in some respects and supplemented it in others. The only provision then adopted and material here expressly subjects to the jurisdiction of the local county courts the estates of Osages who are deceased or are orphan minors, insane or otherwise incompetent. That provision is as follows:

" Sec. 3. That the property of deceased and of orphan minor, insane, or other incompetent allottees of the Osage Tribe, such incompetency being determined by the laws of the State of Oklahoma, which are hereby extended for such purpose to the allottees of said tribe, shall, in probate matters, be subject to the jurisdiction of the county courts of the State of Oklahoma, but a copy of all papers filed in the county court shall be served on the superintendent of the Osage Agency at the time of filing, and said superintendent is authorized, whenever the interests of the allottee require, to appear in the county court for the protection of the interests of the allottee. The super-

intendent of the Osage Agency or the Secretary of the Interior, whenever he deems the same necessary, may investigate the conduct of executors, administrators, and guardians or other persons having in charge the estate of any deceased allottee or of minors or persons incompetent under the laws of Oklahoma, and whenever he shall be of opinion that the estate is in any manner being dissipated or wasted or is being permitted to deteriorate in value by reason of the negligence, carelessness, or incompetency of the guardian or other person in charge of the estate, the superintendent of the Osage Agency or the Secretary of the Interior or his representative shall have power, and it shall be his duty, to report said matter to the county court and take the necessary steps to have such case fully investigated, and also to prosecute any remedy, either civil or criminal, as the exigencies of the case and the preservation and protection of the interests of the allottee or his estate may require," etc.

Next came the Act of March 3, 1921, with which we are particularly concerned. It enlarges the period for which the oil, gas, coal and other minerals were reserved, extends the life of all valid oil and gas leases existing at the end of the original period and changes the original plan in some other particulars. Section 4 is the important one here and reads as follows:

" Sec. 4. That from and after the passage of this Act the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter, and so long as the income is sufficient to pay to the adult members of said tribe not having a certificate of competency

$1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians, and to pay for maintenance and education to the parents or natural guardians or legal guardians actually having minor members under twenty-one years of age personally in charge $500 quarterly out of the income of said minors all of said quarterly payments to legal guardians and adults, not having certificates of competency to be paid under the supervision of the Superintendent of the Osage Agency, and to invest the remainder after paying all taxes of such members either in United States bonds or in Oklahoma State, county, or school bonds, or place the same on time deposits at interest in banks in the State of Oklahoma for the benefit of each individual member under such rules and regulations as the Secretary of the Interior may prescribe," etc.

While this section is in some respects loosely framed, we think its purpose and meaning are reasonably plain,— particularly when it is examined in the light of the prior acts, the mischief it was intended to correct and its legislative history.

When the first act was passed it was believed that the income to be paid quarterly would not be in excess of the current needs of the members. For about ten years that proved to be true. Thereafter increased production of oil and gas under the leases that were given resulted in royalties which swelled the income to a point where the quarterly payments were greatly in excess of current needs and were leading to gross extravagance and waste. Administrative measures restricting the payments were adopted, but their validity was questioned (see *Work* v. *Mosier,* 261 U. S. 352) and the matter was called to the attention of Congress by the Secretary of the Interior. The Secretary recommended the enactment of a provision which, as respects all members other than adults

with certificates of competency, would enable him, in his discretion, to limit the payments to amounts deemed necessary for the maintenance of the members and to invest the excess for their benefit for such time and in such manner as appeared to him advisable.  A bill to that effect was introduced but not passed.  Instead § 4, as set forth above was enacted.  It evidently is designed to be comprehensive of payments to members of every class; to distinguish between such adults as have certificates of competency and such as are without them, and also between adults and minors; to cover all payments to legal guardians, whether on behalf of incompetent adults or minors, and all payments to parents on behalf of minor children; to limit the amounts to be paid where a limit is deemed advisable, and to authorize and require the investment of the excess in designated securities or time deposits.  Unlike the provision that was proposed and rejected, the section is intended in itself to limit the amounts to be paid, in so far as they are to be limited, and to prescribe the manner of investing the excess.  Thus it directly determines the questions which the rejected provision was intended to commit to the judgment of the Secretary.

The obviously mistaken use of the words " to pay " and " to invest " in some of the clauses instead of " shall cause to be paid " and " shall invest ", or their equivalents, does not introduce any uncertainty into the section or affect its meaning.  The sense is made plain by the context.

In our opinion the section must be taken as making it the plain duty of the Secretary to cause the several payments of income to be made in the amounts and at the times specified, and to invest the excess, where there is such, in prescribed securities, or to deposit it in prescribed banks, for the benefit of those to whom it is owing.  The investment clause obviously refers to the moneys which

are withheld, not to those which are paid. Where the payment is to a guardian, the county court alone is empowered to direct and control the investment of what is paid. This is apparent when the section is read, as it should be, with § 3 of the Act of 1912, before quoted. Under the latter the Secretary may invoke action by the county court in respect of any matter affecting the Indian ward's estate, and, where he does, he is entitled as of right to a full consideration of the matter presented; but he can exercise no direct control over the use or investment of the money after it is paid to the guardian.

The defendant relies on the clause requiring all payments to guardians and adults without certificates of competency to be made " under the supervision " of the superintendent of the Osage Agency; but we think this clause is not intended to cut down or narrow the others and that it refers to a supervision designed to effectuate the payments specifically directed by other clauses, and gives no warrant for imposing conditions at variance with such directions. There is ample room for supervision, and also need of it, without enlarging or narrowing any clause by construction.

We hold therefore that the Secretary exceeded his authority in imposing a restriction as to how the money should be invested or deposited after it was paid to the guardian.

For the purposes of these payments the section assigns the members to three major classes. The first comprises all adults having certificates of competency, the second all adults who are without such certificates, and the third all minors. The directions for payment take up the classes in that order. As to the first the direction is that the member be paid his full share of the income. Whatever is due is to be paid. As to the other classes the directions begin with the qualifying words " so long as the income is sufficient " and then proceed to require

19458°—25——15

that specific amounts be paid. As to the third class the amount is $500 for each member, whether the payment is to his parents or to his guardian. As to the second class the direction, apart from the qualifying words just noticed, is,—" to pay to the adult members of said tribe not having a certificate of competency $1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians."

In his answer the defendant took the position that this provision, while limiting each payment to $1,000 out of the member's share where he is without a guardian, requires that the full share be paid where he has a guardian. Afterwards the defendant changed his position and came to insist that the limit of $1,000 applies where the member has a guardian as well as where he is without one. The courts below acceded to the first position. But we are of opinion that the later insistence is right. The directions as a whole show that the personal capacity of the member is made the test of whether his full share of the income shall be paid, or only a limited amount deemed sufficient for his current needs. If he is an adult and has a certificate of competency showing he is fully capable of managing his own affairs the full share is to be paid; otherwise only a limited sum,—$1,000 where he is an adult and $500 where he is a minor. The clause saying, " except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians ", is not an independent direction but merely an excepting clause showing that the income which under the principal provision would be payable to the ward is to go to the guardian. In this respect it puts guardians of members who are in the second class on the same plane that the next provision puts guardians of members who are in the third class. In both cases the guardian is to receive what would

go to the ward if he were not under guardianship, and no more. This is what naturally would be expected, and we think it is what the statute intends.

Our conclusion on the whole case is that a writ of mandamus was rightly awarded, but that instead of commanding the defendant to pay the ward's full share of the inccme, it should have commanded him to recognize and respect the right of the relator to be paid, without any restriction as to how the same should be invested or deposited, $1,000 quarterly out of the ward's share so long as it is sufficient for the purpose. Because of the error in that regard, the judgments of both courts will be reversed and the case remanded to the Supreme Court of the District for the entry of a judgment in conformity with this opinion.

*Judgment reversed.*