**UNITED STATES v. HUGHES, County Treasurer, et al.**

No. 488.

District Court, N. D. Oklahoma.
May 1, 1934.

John M. Goldesberry, U. S. Dist. Atty., of Tulsa, Okl., and Louis N. Stivers, Asst. U. S. Dist. Atty. and Osage Tribal Atty.,

T. J. Leahy, and Leahy, MacDonald & Files, all of Pawhuska, Okl., for complainant.

F. M. Dudley, Asst. Atty. Gen., of Oklahoma, and James P. Devine, Co. Atty., Frank T. McCoy, John R. Pearson, and L. A. Justus, Jr., all of Pawhuska, Okl., for defendants.

FRANKLIN E. KENNAMER, District Judge.

This action was instituted by the United States for and on behalf of certain designated restricted members of the Osage Indian Tribe and restricted Osage Indian heirs of specifically designated deceased members of the Osage Tribe of Indians against the county treasurer, county assessor, members of the board of county commissioners, and the tax ferret of Osage county, Okl. The object of the action is to enjoin the defendants from assessing personal property, choses in action, and money owned by the restricted members of the Osage Indian Tribe in their possession or in the possession of guardians and administrators, for taxation, and from placing the same upon the tax rolls of Osage county.

The action is limited to property of restricted Osage Indians, the members of the Osage Tribe who have not been granted certificates of competency and who are under the guardianship of the United States. The action is not directed to assessments levied upon real estate, but refers only to personal property, choses in action, and cash.

The case was referred, and the master reported his findings to the court. Upon exceptions being filed to the master's report, hearings have been had before the court and a decision announced. In order to aid counsel in the preparation of the proper decree herein, legal conclusions of the court will be set forth.

It is necessary to consider the various acts of Congress for a determination of the questions presented, and the effective dates of the pertinent acts make it necessary to classify the property. This was undertaken by counsel in the presentation of the case before the master, and a stipulation was entered into relative to the taxability of properties of the members of the Osage Tribe of Indians involved in this action, as follows:

"No. 1. Funds and property other than real property in the hands of such members of the Osage Tribe of Indians, or their guardians, or administrators, special and general, or the executors of their Last Will, on hand

January 1st of each year preceding March 3rd, 1921.

"No. 2. The balance on hand January 1st of each year succeeding March 3rd, 1921, and up to and including January 1st, 1925, of the $1000.00 provided to be paid under the Act of March 3rd, 1921 to adult members of the Tribe, or to their guardians, or their administrators, special or general, of their estate, or their executors of their Last Will, and also money paid to such Indians out of their funds under said Act for the support and maintenance of their minor children and widows' allowance, if any, and all property, other than real estate, which may have been purchased by such Indians out of the $1000.-00 paid them quarterly, or the money paid to them for the support of their minor children on hand, or in the hands of such Indians on January 1st of each of said years, or in the hands of their guardians, or administrators, special and general, of their estate, or the executors of their Last Will.

"No. 3. The money paid quarterly to members of the Osage Tribe of Indians under the Act of February 27th, 1925, or to their guardians, administrators, special and general, of their estates, or executors of their Last Will, including widow's allowance and money paid for the maintenance or minor children, same as provided in Classification No. 2 above.

"No. 4. All monies paid by the Secretary of the Interior after the passage of the Act of March 3rd, 1921, to guardians of such Indians in excess of $1000.00 quarterly, and $500.00 for the support of the minor children of such Indians, and property or securities, in which such excess money was invested by said guardians during the time such funds, or property in which the funds were invested, were in the hands of such guardians, including (A) excess funds actually returned to the Secretary of the Interior; and (B) properties, monies, securities and investments accounted for purchased with such excess funds and left under settlement with the Secretary of the Interior in the hands of guardians, administrators, special and general of their estate, and executors of their Last Will.

"No. 5. Property purchased by funds in the hands of guardians for such Indians after February 27, 1925, and monies in the hands of guardians, administrators, special and general, of their estates, and executors of their Last Will, after the passage of said Act of February 27th, 1925.

"No. 6. Monies borrowed by the guardians, administrators or executors as such on hand January 1st of each year, whether with or without the consent of the Secretary of the Interior.

"No. 7. Rentals from real estate, whether homestead, surplus, inherited or purchased real estate.

"No. 8. Interest received by such Indians, their guardians or administrators, special and general, of their estates, or executors of their Last Will, from the following sources, to-wit:

"A—Interest on trust funds allotted to such Indians under the Act of Congress of June 28th, 1906.

"B—Interest on notes secured by real estate mortgages where state mortgage tax not paid.

"C—Interest on United States Bonds.

"D—Interest on State, County or Municipal Bonds, including School District bonds.

"E—Interest on funding bonds.

"F—Interest on deposits in banks, including certificates of deposit, where chose in action tax not paid and not rendered for assessment.

"G—Interest on other investments, if any.

"No. 9. Funds and property in the hands of guardians, administrators, special and general, of their estate, and executors of their Last Will, prior to the distribution of the same.

"No. 10. Funds mentioned in Classification No. 9 after distribution to the heirs.

"No. 11. Monies received from the sale of unrestricted property.

"No. 12. Monies received from the sale of restricted property.

"No. 13. Inherited monies and property in the hands of guardians prior to 1925 and not distributed through administrators or executors.

"No. 14. Balance of funds at the close of guardianship returned to the Osage Indian Agency."

The propriety of the classification will become apparent upon a consideration of the acts of Congress and the other principles governing such matters.

The contention of complainant is that the property of restricted Osage Indians, purchased with restricted funds or funds over which the United States has complete control for and on behalf of its dependent wards, is not subject to taxation by the state of Oklahoma. It concedes that all property purchased with funds over which the govern-

ment has no control, and which are designated as unrestricted funds, is subject to taxation. The taxing authorities, defendants herein, urge that, when funds are released by the United States to the members of the Osage Tribe of Indians, their guardians or administrators, such funds become unrestricted, and, if invested in property, such property is taxable by the state of Oklahoma. They further insist that property acquired with funds of deceased members of the Osage Tribe of Indians in the hands of administrators, is taxable, while complainant contends that such property, if held by the administrator for distribution to restricted heirs of the deceased members, is not taxable. Complainant further contends that guardians for members of the Osage Tribe of Indians are mere instrumentalities and agencies of the federal government for the administration of the affairs of the tribal members, and that funds or property in their hands, if for incompetent members of the tribe, is not taxable, just as such funds or property is not subject to taxation by the state of Oklahoma if held by the federal government for the dependent members of the tribe.

The Act of Congress of June 28, 1906 (34 Stat. 539), provided for the enrollment of members of the Osage Tribe of Indians; it further provided for the division of the funds, as well as about a million and a half acres of land which the federal government held in trust for the members of the tribe. Provision was made for an equal division among the members of the tribe of the trust fund and the lands, and it was divided by placing to the credit of each member of the tribe his pro rata share, which was to have been held for the benefit of himself and his heirs for the period of 25 years and then paid over to them respectively. The oil, gas, coal, and other mineral rights in and under the land were reserved to the tribe for the period of 25 years, and by subsequent acts of Congress the period has twice been extended beyond the 25 years specified in the act. Disposition was also made of other lands, and provision was made for the issuance of certificates of competency by the Secretary of the Interior for any adult member, subject to the act and rules and regulations to be promulgated thereunder. It is unnecessary to consider the details of the act for the determination of the questions involved herein. Upon the issuance of a certificate of competency to an adult member of the tribe, all his surplus lands, which were lands in addition to lands set apart for him as a homestead, became taxable.

By the Act of April 18, 1912 (37 Stat. 86, 87), Congress authorized the Secretary of the Interior to pay to any member of the tribe, under rules and regulations to be prescribed by him, all or part of the funds held for his benefit, provided the Secretary of the Interior was satisfied that the allottee was competent or that such payment would be to the manifest best interest and welfare of such tribal member.

The Act of March 3, 1921 (41 Stat. 1249), provides, among other things, that the Secretary of the Interior shall cause to be paid, quarterly, to each adult member of the Osage Tribe having a certificate of competency, his or her pro rata share of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter, and $1,000 quarterly to incompetent adult members and $500 quarterly for minors. Provision was also made for the payment to the guardians of the incompetent members and for the investment of the remainder of the funds credited to the incompetent members. The United States Supreme Court, in Work v. United States ex rel. Lynn, 266 U. S. 161, 45 S. Ct. 39, 69 L. Ed. 223, held that under the provisions of this act only $1,000 quarterly could be paid to the legal guardians for incompetent and adult members of the tribe, and that all other funds of said incompetent should be withheld by the Secretary of the Interior and disposed of or invested as provided in section 4 of the act (41 Stat. 1250). Subsequent to this decision, Congress amended the Act of March 3, 1921, by the Act of February 27, 1925 (43 Stat. 1008 [25 USCA § 331 note]), which provided, among other things, that: "All moneys now in the possession or control of legal guardians heretofore paid to them in excess of $4,000 per annum each for adults and $2,000 each for minors under the Act of Congress of March 3, 1921, relating to the Osage Tribe of Indians, shall be returned by such guardians to the Secretary of the Interior, and all property, bonds, securities, and stock purchased, or investments made by such guardians out of said moneys paid them shall be delivered to the Secretary of the Interior by them, to be held by him or disposed of by him as he shall deem to be for the best interest of the members to whom the same belongs."

It was further provided in said act that: "All funds other than as above mentioned, and other property heretofore or hereafter received by a guardian of a member of the Osage Tribe of Indians, which was thereto-

fore under the supervision and control of the Secretary of the Interior or the title to which was held in trust for such Indian by the United States, shall not thereby become divested of the supervision and control of the Secretary of the Interior or the United States be relieved of its trust; and such guardian shall not sell, dispose of or otherwise encumber such fund or property without the approval of the Secretary of the Interior, and in accordance with orders of the county court of Osage County, Oklahoma."

The above provisions of congressional acts clearly evidence an intention and design of Congress that the United States shall have supervision and control, through the Secretary of the Interior, of all property, bonds, securities, and stock purchased or investments made, of all restricted Osage allottees, except $4,000 annually for adults and $2,000 annually for minors. The latter act expressly reimposes restrictions upon the property upon incompetent members of the Osage Tribe, whether the property is in the actual control of the Secretary of the Interior, or in the hands of guardians. Defendants seriously contend that, as the funds due incompetent Osage allottees are released to their guardians, who in turn invest such funds in personal property which had theretofore been subject to taxation by the state of Oklahoma, such property continued to be taxable even though held for the benefit of restricted Osage Indians. Reliance is placed upon the case of McCurdy v. United States of America, 246 U. S. 263, 38 S. Ct. 289, 62 L. Ed. 706, in support of this contention. The cited case involved the taxability of real estate purchased by a trustee with funds held by the Department of the Interior for an incompetent Osage allottee. The United States Supreme Court held in the cited case that the real estate, subject to taxation prior to the purchase for the incompetent Indian, continued to be taxable. The case, however, is not controlling of the questions here presented. The principles upon which the decision is based are wholly different from those involved in the instant case. At the outset, it should be observed that the cited case was decided March 4, 1918, and prior to the enactment of the Act of March 3, 1921, and the Act of February 27, 1925. The court, in considering the Acts of June 28, 1906, and of April 18, 1912, concluded that the Secretary of the Interior was authorized to prescribe the rules and regulations under which funds shall be released, but that he was not given authority under those acts to exercise control of any property in which the funds released may thereafter have been invested, or otherwise to create with the released funds a governmental instrumentality for the protection of the Osages. The court further concluded that there was nothing in the act, or in the fact to which it applied, that indicated a purpose to extend governmental control to property in which released funds may have been invested. It was further announced that the regulations contemplated supervision of the expenditure of the money, and not control of the property, if any, for which the money was expended. Although restrictions upon alienation were inserted in the deed, the court concluded that this was not a continuation of control reserved by the Secretary of the Interior. Since the decision of the cited case, as above stated, Congress provided, by the Act of March 3, 1921, as amended by Act Feb. 27, 1925 (25 USCA § 331 note) that only $4,000 annually should be paid to incompetent adult Osage Indians, and $2,000 to minors. Although the entire funds to the credit of the incompetent members of the tribe were paid to the guardians of such incompetents, still the erroneous payment of such excess funds did not constitute a release of such funds. The error in the payment was established in the decision of Work v. United States, supra, and after that decision, provision was made by Congress in the Act of February 27, 1925, for the return of all property and investments made by the guardians to the Secretary of the Interior. Accountings were required of such guardians, and they were credited with $4,000 annually for all adult members and $2,000 annually for all minors. It has been judicially determined that, while an Indian is still a ward of the nation, there is power in Congress to reimpose restrictions on property already freed. Brader v. James, 246 U. S. 88, 38 S. Ct. 285, 62 L. Ed. 591; McCurdy v. United States, supra. Even if payments of excess funds by the Secretary of the Interior to guardians of incompetent Osage allottees constituted a release of such funds, and the property purchased therewith and investments made by use of such funds, had become freed, still Congress, by passing the Act of February 27, 1925, reimposed restrictions upon all such property, and placed all such property under the direct control of the Secretary of the Interior. By so doing, such property was exempt from taxation by the state of Oklahoma.

■ In Jaybird Mining Company v. Weir, 271 U. S. 609, 46 S. Ct. 592, 593, 70 L. Ed. 1112, the Supreme Court of the United

States stated the following: "It is elementary that the federal government in all its activities is independent of state control. This rule is broadly applied; and, without congressional consent, no federal agency or instrumentality can be taxed by state authority. 'With regard to taxation, no matter how reasonable, or how universal and undiscriminating, the state's inability to interfere has been regarded as established since McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579.' Johnson v. Maryland, 254 U. S. 51, 55, 41 S. Ct. 16, 65 L. Ed. 126, 128. And see Farmers' & M. Sav. Bank v. Minnesota, 232 U. S. 516, 34 S. Ct. 354, 58 L. Ed. 706; Choctaw, O. & G. R. Co. v. Harrison [235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234], supra; Gillespie v. Oklahoma, 257 U. S. 501, 505, 42 S. Ct. 171, 66 L. Ed. 338, 340."

It is urged that, because restricted funds were invested in property theretofore taxed by the state of Oklahoma, such property continued to be subject to taxation, even though owned by a restricted Osage allottee or held by a guardian or administrator for such restricted tribal member. This reasoning is unsound because whenever property, whether subject to state taxation or not, comes into the control of a federal agency or instrumentality, it cannot be taxed by the state. An elementary example is the purchase of real estate which had been subject to state taxation, by the Post Office Department of the United States government, as a site for a post office. Upon its acquisition by the United States, it is no longer taxable by the state. By the same token, the purchase of chattels or personal property by the federal government relieves such chattels of state tax burdens. The same is true whether such property is acquired by the federal government for governmental purposes, or whether acquired by a federal agency or instrumentality for the benefit of its Indian wards. The United States Supreme Court, in United States v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 480, 47 L. Ed. 532, considered the authority of the state of South Dakota to tax land and personal property allotted to Indians within that state, and employed the following language in disposing of the controversy:

"If, as is undoubtedly the case, these lands were held by the United States in execution of its plans relating to the Indians,—without any right in the Indians to make contracts in reference to them, or to do more than to occupy and cultivate them,—until a regular patent conveying the fee was issued to the several allottees, it would follow that there was no power in the state of South Dakota, for state or municipal purposes, to assess and tax the lands in question until at least the fee was conveyed to the Indians. These Indians are yet wards of the nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the act of 1887, and the agreement of 1889, ratified by the act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship. To tax these lands is to tax an instrumentality employed by the United States for the benefit and control of this dependent race, and to accomplish beneficent objects with reference to a race of which this court has said that 'from their very weakness and helplessness, so largely due to the course of dealing of the Federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.' United States v. Kagama, 118 U. S. 375, 384, 6 S. Ct. 1109, 1114, 30 L. Ed. 228, 231. So that if they may be taxed, then the obligations which the government has assumed in reference to these Indians may be entirely defeated; for by the act of 1887 the government has agreed at a named time to convey the land to the allottee in fee, discharged of the trust, 'and free of all charge or encumbrance whatsoever.' To say that these lands may be assessed and taxed by the county of Roberts under the authority of the state is to say they may be sold for the taxes, and thus become so burdened that the United States could not discharge its obligations to the Indians without itself paying the taxes imposed from year to year, and thereby keeping the lands free from encumbrances. * * *

"The answer to this question is indicated by what has been said in reference to the assessment and taxation of the land and the permanent improvements thereon. The personal property in question was purchased with the money of the government, and was furnished to the Indians in order to maintain them on the land allotted during the period of the trust estate, and to induce them to adopt the habits of civilized life. It was, in fact, the property of the United States, and

was put into the hands of the Indians to be used in execution of the purpose of the government in reference to them. The assessment and taxation of the personal property would necessarily have the effect to defeat that purpose."

Although restricted adult allottees were entitled to $4,000 per year, and minors, $2,000 per year, still such sums, in the hands of guardians appointed for minors and incompetent adults, retain their restrictive character by virtue of section 1 of the act of 1925 (25 USCA § 331 note) which provides:

"All payments to legal guardians of Osage Indians shall be expended subject to the joint approval in writing of the court and the superintendent of the Osage Agency."

It has been determined in Hickey v. United States, 64 F.(2d) 628 (10 C. C. A.), that Congress reimposed restrictions and subjected to the supervision and control of the Secretary of the Interior all funds in the hands of guardians, which in their inception were under such supervision and control, and that upon the resignation of a guardian it became his duty to immediately deliver such funds to the Superintendent of the Osage Indian Agency. Therefore, whatever funds were in the hands of guardians of restricted, incompetent, and minor Osage Indians since the passage of the 1925 act were restricted, and not subject to taxation by the state of Oklahoma. All such funds which had been turned over to the Indians by their guardians are taxable by the state in the hands of such Indians. All personal property acquired by investments of such funds by guardians, whether in the hands of guardians or their wards, is subject to taxation because the restriction goes only to the funds, and not to the property in which such funds are invested. It clearly appears that, whenever the money, i. e. the $4,000 annually to adults and $2,000 annually to minors is expended by the guardian, with the approval of the court and the Superintendent of the Osage Agency, whether such property is held by the guardian or delivered to the Indian, it is freed of restrictions and is subject to taxation by the state.

The above conclusions pertain only to the $4,000 released to adult incompetent Osage Indians and $2,000 to minor members of the Osage Tribe.

■ The remaining question for decision is the taxability of property or funds in the hands of administrators and executors. This question may be disposed of by a considera-tion of the principles of law heretofore expressed relative to the status of property, from taxation standpoint, in the hands of incompetent allottees and their guardians. Funds or property acquired by the investment of such funds in the hands of administrators or executors are not taxable by the state of Oklahoma if the funds or property acquired by the investment of such funds are restricted. If payments had wrongfully been made by the Secretary of the Interior to executors or administrators of incompetent deceased Osage allottees, and if such payments had been invested in personal property, under the acts above referred to, such funds or the property acquired with such funds would all be subject to the control of the Secretary of the Interior, and would remain trust property and be free from state taxation. It is my view that, if the property in the hands of executors or administrators is subject to the control of the United States government for and on behalf of the dependent Osage allottee, it is not taxable.

■ The various acts of Congress provide that the income of the deceased allottee shall be paid to the heirs of the deceased, and the administrators and executors were without any right to receive the income derived from the interest of a deceased allottee in the mineral resources of the tribe, but the same should have been credited to the heirs and held under the supervision and control of the Secretary of the Interior. Provision was made in the Act of June 28, 1906, for the distribution of the lands, mineral interests, and moneys held in trust by the United States to the individual members of the Osage Tribe, or their heirs, at the expiration of 25 years, which term has been extended. It also provided that the descent to the heirs shall be in accordance with the laws of the territory of Oklahoma, or, in the event Oklahoma became a state, according to the laws of the state, and also provided that, if the decedent left no issue, nor husband, nor wife, that the interest should go to the father and mother equally. This is the only provision in all the acts of Congress relating to the distribution of funds to the members of the Osage Tribe which prescribes what shall become of the mineral interest after the death of the allottee. Under the act, no creditor had a right to take over, by legal process, or have the lands, moneys, or mineral interests of a member of the Osage Tribe of Indians levied upon to satisfy any judgment for debt. See Neilson v. Alberty, 36 Okl. 490, 129 P. 847.

The Act of April 18, 1912, conferred au-

thority upon the courts of Oklahoma to administer upon the estate of a member of the Osage Tribe of Indians, and jurisdiction was given to the county courts of the state of Oklahoma in probate matters of Osage allottees, subject to limitations upon the manner in which such jurisdiction shall be exercised. The act (section 7) provided that the lands or funds of Osage tribal members shall not be subject to any claim against the same arising prior to the grant of the certificate of competency, and that no lands or moneys inherited from Osage allottees shall be subject to be taken or sold to secure the payment of any indebtedness incurred by such heir prior to the time such land and money was turned over to such heirs. Inherited moneys were made liable for funeral expenses, as well as expenses of last illness of the deceased Osage allottee, and it was further provided that nothing contained in the act should be construed so as to exempt any such property from liability for taxes. The act referred only to moneys that the deceased had at the time of his death or which were due him at that time. No provision was made for the payment of the indebtedness of the deceased allottee or any moneys that may come to his heirs, except the reference to the funeral expenses and expenses of last illness. It thus appears that the intent and purpose of the congressional acts is that the heirs of the deceased allottees shall take over the right to receive the subsequent quarterly payments after the allottee's death that come from the mineral interests and the tribal property of the deceased allottee's. Reasons have been advanced for such legislation, which appear to be sound. Among the purposes advanced is that Congress was undertaking to protect the heirs of deceased members of the tribe, because it was apparent that many of the heirs would be unallotted members of the tribe, and would not have participated in the distribution of the tribal property. This, it is asserted, was not only a protection to the Indian, but was a protection to the government from having to appropriate moneys in the future for the support of such heirs.

The Circuit Court of Appeals for the Tenth Circuit in Taylor v. Tayrien et al., 51 F.(2d) 884, held that an Osage allottee had no vested interest nor interest that could be assigned or transferred, nor interest subject to the jurisdiction of the courts, in the future income of the tribe derived from its mineral resources. The precise question was whether or not the headright of an Osage allottee of less than one-half blood, with a certificate of competency, passed to his trustee in bankruptcy. It was determined that such a headright or interest of the allottee in the future income of the tribe derived from its mineral resources does not pass to his trustee in bankruptcy, and was not subject to the jurisdiction of the bankruptcy courts. The Supreme Court of Oklahoma decided that the income accruing to the headright of a deceased Osage allottee, subsequent to the death of such allottee, is not an asset of the estate of such decedent which can be appropriated for the payment of claims of creditors. Denoya v. Arrington, Executor, 163 Okl. 44, 20 P.(2d) 563. Thus, if such future incomes cannot be used for the payment of claims of creditors, then they should pass to the heirs or devisees immediately upon the death of the allottee. Such funds should not be paid to the administrators or executors of such deceased allottees, but should pass directly to the heirs or devisees. If such heirs or devisees are incompetent because of minority or because of not having a certificate of competency, such funds should be distributed to such heirs in accordance with the provisions of the congressional acts. If such funds had erroneously been paid to administrators and executors, the funds, or investments made with such funds, are subject to the control of the Secretary of the Interior, and are subject to be retaken by the Secretary of the Interior and held in trust by the Interior Department. The courts of Oklahoma were without jurisdiction of the members of the Osage Tribe until Congress conferred jurisdiction upon them. Such jurisdiction was conferred subject to limitations, and by reason thereof the executors and administrators of deceased incompetent Osage allottees are agencies and instrumentalities of the federal government. Properties and funds in their hands, restricted in character, and under the control of the Secretary of the Interior, retain their character as trust funds, and it can make no difference whether the funds and the property acquired from investing such funds are in the hands of administrators or executors of deceased incompetent allottees, or in the hands of the Secretary of the Interior; if they are restricted funds, or property acquired from investing such funds, they are not subject to taxation. I therefore conclude that such funds, whether in the hands of the Department of the Interior or in the hands of executors or administrators of deceased incompetent Osage allottees, whether paid over by the Department of the Interior or by guardians to such executors and administrators, erroneously or unlawfully, by reason of the congressional acts above re-

ferred to, such funds or property are restricted in character, subject to the control and domination of the Secretary of the Interior, and are not subject to taxation.

Applying the conclusions herein reached to the classifications set out herein, appropriate findings of fact should be made as follows:

■ 1. Funds and property other than real property in the hands of such members of the Osage Tribe of Indians, or their guardians, or administrators, special and general, or the executors of their last will, on hand January 1st of each year preceding March 3, 1921, are subject to taxation by the defendants or taxing authorities of Osage county, Okl., for the reason that such funds were released to Osage allottees or their guardians or administrators, and the control of such funds or property is not retained by the United States government for the allottees.

2. The balance on hand January 1st of each year succeeding March 3, 1921, and up to and including January 1, 1925, of the $1,000 provided to be paid under the Act of March 3, 1921, to adult members of the tribe, or to their guardians, or their administrators, special and general, of their estates, or their executors of their last will, and also money paid to such Indians out of their funds under said act for the support and maintenance of their minor children's and widow's allowance, if any, and all property, other than real estate, which may have been purchased by such Indians out of the $1,000 paid them quarterly, or the money paid to them for the support of their minor children on hand, or in the hands of such Indians on January 1st of each of said years, or in the hands of their guardians, or administrators, special and general, of their estate, or the executors of their last will—these funds or property acquired by investment of such funds are subject to taxation by the state of Oklahoma, because it was intended that $1,000 per quarter should be released from the trust funds for adults and $500 per quarter for minors, and a congressional intent is apparent that no control whatever was to have been retained over such payments by the federal government.

3. The money paid quarterly to members of the Osage Tribe of Indians under the Act of February 27, 1925, or to their guardians, administrators, special and general, of their estates, or executors of their last will, including widow's allowance and money paid for the maintenance of minor children, same as provided in classification No. 2 above—

such funds in the hands of guardians, administrators, or executors are not subject to taxation because of the restrictions imposed upon such funds. Property acquired from investments of such funds should be subject to taxation because no intention appears to retain control or supervision over such property.

4. All moneys paid by the Secretary of the Interior after the passage of the Act of March 3, 1921 (41 Stat. 1249), to guardians of such Indians in excess of $1,000 quarterly, and $500 for the support of the minor children of such Indians, and property or securities, in which such excess money was invested by said guardians during the time such funds, or property in which the funds were invested, were in the hands of such guardians, including (a) excess funds actually returned to the Secretary of the Interior, and (b) properties, moneys, securities, and investments accounted for purchased with such excess funds and left under settlement with the Secretary of the Interior in the hands of guardians, administrators, special and general, of their estate, and executors of their last will— such moneys or property acquired by investing such funds are not subject to taxation by the state of Oklahoma, because restrictions were imposed upon the moneys and properties in excess of $1,000 quarterly for adults and $500 for minors, and all such moneys and properties, whether held by the Secretary of the Interior or accounted for but held by guardians, administrators, or executors, were restricted, and held in trust by the United States, and its agencies, guardians, administrators, or executors, and were not subject to taxation.

5. Property purchased by funds in the hands of guardians for such Indians after February 27, 1925, and moneys in the hands of guardians, administrators, special and general, of their estates, and executors of their last will, after the passage of said Act of February 27, 1925—such property is not subject to taxation unless acquired from investing the $1,000 quarterly payments for adults and $500.00 quarterly payments for minors, for the reason that such funds were restricted and the property acquired by investments of such funds likewise was restricted, and under the control of the federal government for the dependent Osage allottees.

■ 6. Moneys borrowed by the guardians, administrators, or executors as such on hand January 1st of each year, whether with or without the consent of the Secretary of the

Interior—all such funds borrowed without the consent of the Secretary of the Interior are subject to taxation by the state of Oklahoma, because no control of such funds is retained by the federal government; all moneys borrowed by guardians, administrators, or executors with the permission of the Secretary of the Interior, are not subject to taxation by the state of Oklahoma because of the trust character of such funds, the guardians, administrators, and executors being agencies of the federal government in administering the affairs of the dependent Osage allottees.

7. Rentals from real estate constituting a homestead of incompetent Osage allottees are not subject to taxation by the state of Oklahoma; rentals from the surplus real estate of such allottees are taxable whether said lands were inherited or allotted. Rentals from real estate purchased by or for incompetent Osage tribal members are not subject to taxation, if purchased with restricted funds, and where such real estate is under the control and domination of the federal government for its dependent wards. However, rentals from real estate purchased for incompetent Osage allottees from unrestricted funds, and over which the federal government does not exercise control, are subject to taxation.

8. Interest received by such Indians from guardians or administrators or executors on trust funds allotted to such Indians under the Act of Congress of June 28, 1906, is not subject to taxation, and neither is interest on notes secured by real estate mortgages where said mortgage tax is not paid, interest on United States bonds, interest on state, county, or municipal bonds, interest on funding bonds, interest on deposits in banks, including certificates of deposit, where chose in action tax not paid and not rendered for assessment, nor interest on other investments, if the notes, bonds, deposits, or investments were acquired by expending restricted funds. Such property continues to be restricted and as such is under the control of the federal government and is not taxable by the state.

9. Funds and property in the hands of guardians, administrators, special and general, of their estate, and executors of their last will, prior to the distribution of the same, is not subject to taxation by the state of Oklahoma unless such property, or a portion thereof, came from funds released from trust, such as the $1,000 quarterly payments for adults and $500 for minors.

10. Funds mentioned in classification No. 9 after distribution to the heirs are not taxable for the reasons stated with reference to classification No. 9.

11. Moneys received from the sale of unrestricted property are taxable by the state of Oklahoma.

12. Moneys received from the sale of restricted property are not taxable by the state of Oklahoma because of the control of the federal government over such funds.

13. Inherited moneys and property in the hands of guardians prior to 1925 and not distributed through administrators or executors are subject to taxation if such funds and property are properly in the hands of such guardian, having been lawfully paid to them by the Secretary of the Interior, and if not held in trust by said guardians as an agency of the federal government; if unlawfully held by such guardian, or held for the benefit of the Secretary of the Interior, such moneys and property are not subject to taxation.

14. Balance of funds at the close of guardianship returned to the Osage Indian Agency is not subject to taxation because of the control of the federal government over such funds.

A decree may be entered in accordance with the conclusions herein announced.