**UNITED STATES v. JOHNSON, Bank Com'r, et al.**

**No. 1411.**

Circuit Court of Appeals, Tenth Circuit.

Dec. 16, 1936.

Chester A. Brewer, Asst. U. S. Atty., of Tulsa, Okl. (C. E. Bailey, U. S. Atty., of Tulsa, Okl., on the brief), for the United States.

Gentry Lee, of Tulsa, Okl., and A. Francis Porta, of El Reno, Okl. (L. V. Orton, of Pawnee, Okl., and Roscoe E. Harper, of Tulsa, Okl., on the brief), for appellees.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

The appeal in this case presents for decision the question whether money belonging to a restricted full-blood, allotted Osage Indian at the time of her death; subsequently disbursed through the Osage Agency to the administrator of her estate; distributed by the administrator to the guardian of the minor children of the decedent with one-half Indian blood; and by the guardian either invested in certificates of deposit or deposited in a checking account in a bank in Oklahoma which subsequently became insolvent and suspended business—constitutes a preference claim against the assets of the bank in liquidation under section 3466, Revised Statutes, which provides that "whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied." 31 U.S. C.A. § 191.

The facts are without dispute. Esther Berry Smith was a restricted full-blood, allotted member of the Osage Tribe of Indians without a certificate of competency. She died intestate on January 11, 1925, and was survived by a white husband and three minor, unallotted children of one-half Indian blood. At the time of her death she had to her credit in the agency restricted funds in the sum of $117,804.98. The county court of Osage county, Okl., appointed an administrator for her estate on January 27, 1925, and the appointment was approved by the superintendent of the agency on behalf of the Secretary of the Interior. Later that day, the disbursing agent for the agency paid the entire sum to the administrator; and in March an accumulation to the account in the sum of $13,203.12 was paid in like manner. The administrator made payments in June and December, 1925, and in May, 1926, to the legal guardian of the minors which aggregated $22,378.79 each, out of such funds. Such payments were the distributive share of each minor heir in the money of the deceased mother; and they were made on orders of the county court with the approval of the superintendent of the agency. The guardian invested a part of such money in certificates of deposit in the Bank of Commerce at Ralston, Okl., and a part was deposited in a checking account. At the time such investments and such deposits were made, the officers of the bank knew the source from which the money came and they knew that there was some doubt as to whether the disbursement had been rightly made, but they did not know that the United States claimed that the money belonged to it. The bank later merged with the First National Bank of

Ralston, the new institution being called the First Commerce Bank, and the money in question became deposits in it. That bank was declared insolvent in 1932 and the State Bank Commissioner took charge of its affairs for liquidation. The guardian had $35,056.42 on deposit at that time. The preferred claims filed, including the one in question, amount to $55,000, and the common claims to more than $38,000, while the assets do not exceed $15,000.

The United States filed this action to establish a preference claim for the amount of the deposits and to restrain the disbursement of any money to other creditors until such claim has been paid in full. The court entered a decree dismissing the bill. (D.C.) 11 F.Supp. 897. The appeal is from that action.

It is the contention of the United States that the money was wrongfully disbursed to the administrator; that title to it never passed; that the bank accepted the deposits with knowledge of the original source of the money; and that upon the insolvency of the bank, the deposits constituted a debt due the United States within the purview of section 3466, supra. Determination of the contention requires a review of the several statutes affecting members of the Osage tribe, their heirs and their estates.

The Act of June 28, 1906, 34 Stat. 539, provided for the distribution of lands and moneys of the tribe among its members. Provision was made for homestead and surplus allotments. Homestead allotments were inalienable unless otherwise provided by law, and surplus allotments were inalienable for a period of twenty-five years. The mineral rights in all lands were reserved to the tribe for a period of twenty-five years and the Secretary of the Interior was authorized to make leases for that purpose for royalties. Moneys arising from such royalties and money from certain other sources were to be held in trust for twenty-five years, but as soon as practicable after passage of the act they were to be segregated on a pro rata basis and placed to the credit of the members of the tribe. They were to draw interest and the interest was to be paid quarterly. It was further provided that the lands, mineral interests, and moneys of a deceased member should descend to his legal heirs according to the laws of Oklahoma, except that if he should leave no issue or spouse, his father and mother should take in equal shares.

The Act of April 18, 1912, 37 Stat. 86, vested the county courts of Oklahoma with jurisdiction over the estates of deceased members in probate matters. By section 3 it was provided that the courts should have such jurisdiction; that a copy of all papers filed should be served on the superintendent of the agency and that he should be authorized whenever the interest of the allottee should require, to appear in the court for the protection of such interest; and that he should investigate the conduct of executors, administrators, and guardians or other persons having in charge the estate of any deceased allottee or of minors or incompetent persons, and in case of waste, dissipation, or incompetency effecting loss or deterioration in value of the estate, it should be his duty to report the matter to the court and take steps to have it investigated, also to prosecute any civil or criminal remedy for the preservation of the rights of the allottee. The secretary was authorized, in his discretion and under rules and regulations to be prescribed by him, to pay to an allottee all or part of the funds to his individual credit, if the secretary was satisfied of the competency of the allottee and that the release of such funds would be to his interest and welfare.

The Act of March 3, 1921, came next. 41 Stat. 1249. It extended the reservation of the mineral rights for the benefit of the tribe to April 7, 1946, and conferred citizenship on members of the tribe, but provided that such citizenship should not affect their rights in tribal property or the control of the United States over it. Members of less than half-blood were freed of restrictions against alienation of homestead and surplus allotments. Section 4 dealt with the distribution of funds and divided members into three classes for that purpose. It provided that the Secretary should pay quarterly to each adult member having a certificate of competency his pro rata share, either as a member or heir of a deceased member, of the interest on trust funds, bonuses received from the sale of leases, and royalties; that so long as the income was sufficient for the purpose, the Secretary should make (1) quarterly payments of $1,000 to each adult member not having a certificate of competency, except that if an incompetent member had a legal guardian the payments should be made to him; and (2) quarterly payments of $500 to the parents, natural guardians, or legal guardians having ac-

tual custody of a member under the age of twenty-one years, to be used for his maintenance and education; and the Secretary was directed to invest the excess of such funds, after the payment of taxes, in bonds of the United States, or bonds of the State of Oklahoma, or county warrants, or school warrants, or place it on time deposit at interest in banks in Oklahoma. In the administration of that act, the Secretary paid the full pro rata share of the income to legal guardians of incompetent adult members rather than the fixed sum of $1,000; and he undertook to require that they invest such funds in the enumerated bonds or warrants, or deposit them in banks at interest. It was judicially determined that only $1,000 per quarter should be paid to such a guardian; that after such money had been paid the Secretary had no further supervisory control over it in respect to its investment; and that the provision directing investment related to the excess money remaining after such quarterly payments were made. Work v. U. S. ex rel. Lynn, 266 U.S. 161, 45 S.Ct. 39, 69 L.Ed. 223.

In order to effect restoration of the excess sums thus erroneously paid to guardians and to amend existing statutes in certain repects, the Act of February 27, 1925, was enacted. 43 Stat. 1008 (25 U.S.C.A. § 331 note). With changes which are not material, section 1 (25 U.S.C.A. § 331 note) substantially re-enacted the earlier statute in respect to quarterly payments and provided that the excess should be invested in the manner specified or deposited in banks in that state, or expended for the benefit of such member under such restrictions, rules, and regulations as should be prescribed. It provided that no guardian should be appointed for a member of one-half Indian blood or more who does not have a certificate of competency, except on the written application or approval of the Secretary; that all moneys then in the possession or control of legal guardians theretofore paid them in excess of $4,000 per annum for each adult and $2,000 for each minor under the provisions of the Act of 1921 should be returned to the Secretary; that all bonds, securities, stocks, and property purchased, and other investments made by such guardians, should not be subject to alienation, sale, or other disposition without the approval of the Secretary; that they should be returned to the Secretary; and, further, that all funds other than those just men-

tioned, and other property theretofore or thereafter received by guardians which had previously been under the supervision and control of the Secretary, or the title to which was held by the United States for the benefit of such Indian, should not thereby become divested of supervision and control of the Secretary; that such guardians should not sell or encumber such funds or property without the approval of the Secretary and in accordance with the orders of the county court, and that upon the death, resignation, or removal of guardians, such funds and properties should be immediately delivered to the superintendent of the Osage Agency. The Secretary was authorized, upon failure of any guardian to pay such moneys and surrender such property, to institute suit or suits against him and his bondsmen for the enforcement of the rights of the ward. It was provided in section 2 (25 U.S.C.A. § 331 note) that all funds of a restricted member of the tribe of one-half or more Indian blood inherited or bequeathed to him or accruing to his credit, subject to supervision of the superintendent of the agency, when deemed to be for the best interest of such Indian, may be paid to the administrator of the estate of the deceased member or directly to his heirs or devisees, in the discretion of the Secretary.

The Act of March 2, 1929, 45 Stat. 1478, extended the reservation of mineral rights for the benefit of the tribe to April 8, 1958, and provided that upon the death of a member of one-half Indian blood or more who does not have a certificate of competency, the moneys and funds accrued and accruing to his credit and which had theretofore been subject to supervision as provided by law, may in the discretion of the Secretary be paid to the executor or administrator of the estate of the decedent or direct to his heirs or devisees, or retained by the Secretary.

█ It thus will be observed that the Act of 1906 authorized the allotment of land and the segregation of moneys to be held in trust for the fixed period with periodical payment of interest to each member of the tribe; and provided that at death his properties should descend to his heirs according to the laws of Oklahoma with one exception which had no bearing here; but it was silent in respect to the administration of estates. The Act of 1912 vested the county courts of the state with jurisdiction over estates of allottees. It did not contain a provision expressly declar-

ing that title to the property of an estate should vest in the administrator, or that he should be authorized to take possession of it. It was silent in that respect. But it was passed in contemplation of the domestic statutes of the state and they contained a provision that title passes to the heirs of an intestate, subject to the possession of a duly appointed administrator, section 1615, Oklahoma Statutes 1931; and a further provision that an administrator is entitled to such possession. Ib. 1217. The statutory provisions are closely related to the rule at common law that the title to personal property of a deceased person vests in the executor or administrator who holds it subject to fiduciary duties to others. Williams v. Cobb, 242 U.S. 307, 37 S.Ct. 115, 61 L.Ed. 325; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L. Ed. 457; In re Fehlmann's Estate, 134 Or. 46, 292 P. 1027; Collins v. Northwest Casualty Co., 180 Wash. 347, 39 P.(2d) 986, 97 A.L.R. 1235; Michigan Trust Co. v. City of Grand Rapids, 262 Mich. 547, 247 N.W. 744, 89 A.L.R. 840; Messersmith's Estate v. Messersmith, 264 Mo. 610, 175 S.W. 914; Norton v. Lilley, 210 Mass. 214, 96 N.E. 351.

■ This court had occasion quite recently to consider the question at hand. The pertinent provisions of the several acts of Congress as well as the statutes of the state were reviewed, and it was held that an administrator of the estate of a deceased allotted member of the tribe of less than one-half blood was entitled to the personalty belonging to the estate. Globe Indemnity Co. v. Bruce (C.C.A.) 81 F.(2d) 143, certiorari denied 297 U.S. 716, 56 S.Ct. 591, 80 L.Ed. 1001; Stuart v. Tapp (C.C.A) 81 F.(2d) 155. Each of those cases dealt with a member of less than one-half blood, but prior to passage of the Act of 1925 the administrator of the estate of an allottee of more than one-half Indian blood without a certificate of competency was likewise entitled to take the personal property into his possession. The Act of 1921 did not deal with that question. It dealt with quarterly payments to living members or their guardians and with the investment of the excess moneys. The Act of 1925 became effective after the first payment was made to the administrator and before the second. By section 2 of that act (25 U.S.C.A. § 331 note), it was provided that the funds of, a restricted Osage of one-half or more Indian blood acquired by inheritance or be-

quest and which are subject to supervision as specified in the act, may when deemed to be for the best interest of such Indian, be paid to the administrator of the estate of the deceased or direct to the heirs or devisees, in the discretion of the Secretary. The facts attending the second payment are not disclosed. The court must assume in the circumstances that the Secretary deemed it to be for the best interest of the heirs to make such payment to the administrator and directed payment pursuant to that finding, in accordance with the terms of the statute. Any other assumption would violate the rule that administrative officers are presumed to act regularly and in an authorized manner, not irregularly or unauthorizedly.

■ The Act of 1929 lends support for the conclusion that the money was properly disbursed to the administrator. The provision contained in section 4 (45 Stat. 1480) that upon the death of an Osage of one-half Indian blood or more without a certificate of competency the restricted funds accrued or accruing to his estate may, in the discretion of the Secretary, be either paid to the executor or administrator or directly to the heirs or devisees or retained by the Secretary, is the first statute coming to our attention which expressly authorized the Secretary to retain such funds. It evinces a legislative recognition of existing law that funds of that class should be paid to the executor or administrator, or directly to the heirs or devisees, and discloses a clear purpose to superadd authority in the Secretary to retain such funds, in his discretion. There is nothing in the acts of Congress prior to that of 1929 which indicates a purpose to withhold payment of the money accumulating to the credit of an adult member of the tribe of one-half or more Indian blood and without a certificate of· competency, from the duly appointed administrator of his estate. So, we think it is fairly clear that the money in question was paid to the administrator with authority of law, and that after its payment the United States did not have title to it. Title was then vested in the heirs and the right of possession in the administrator.

The administrator made the distributions to the guardian pursuant to orders of the county court with the approval of the superintendent of the agency. It was held in Stuart v. Tapp, supra, that payments made in that manner and not in

contravention of law are the same in effect as though the agency made them direct to the guardian. These distributions were made after the act of 1925 became effective. In providing the duties of guardians, that statute divides money and property into two classes. They are: First, quarterly payments made under the Act of 1921 and prior to the passage of the statute, in excess of $4,000 per annum each for adults and $2,000 per annum each for minors, together with stocks, bonds, securities, and other .property purchased with such excess; and, second, all money other than that just mentioned and other property theretofore or thereafter acquired which had previously been subject to the supervision of the Secretary, or which the United States had held in trust for the Indian. A guardian is required to surrender all money and property in the first class to the Secretary. He is forbidden to sell or encumber property in the second class without an order of the county court and the approval of the Secretary, and in case of his death, resignation, or removal from office, such money and property are to be delivered to the superintendent of the agency, to be held by him and supervised or invested. The money in question was not excessive quarterly payments erroneously made under the Act of 1921. It did not come in the first class. It was money paid to the administrator and by him disbursed to the guardian. It came within the second class. The guardian is therefore required to administer it in accordance with the provision of the act relating to property of that class, and upon his death, resignation, or removal from office, it should be surrendered to the superintendent of the agency.

It is provided in section 4 of the Act of 1929 that upon the settlement of an estate, the administrator shall pay and surrender to the Secretary all money and property previously received from the Secretary, if it was inherited by a minor heir of one-half or more Indian blood, and was subject to the control and supervision of the Secretary at the time. the act became effective. But. these disbursements were made before that act became effective, and for that reason they are not affected by its provisions.

But if it be assumed that the administrator wrongfully disbursed the money to the guardian, what is the situation? The power of Congress to impose or reim-pose restrictions on property of a minor of one-half Indian blood and to require a guardian having possession of it to make restoration to the United States cannot be seriously doubted. Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591; McCurdy v. United States, 246 U.S. 263, 38 S.Ct. 289, 62 L.Ed. 706; Logan v. United States (C.C.A.) 58 F.(2d) 697; Hickey v. United States (C.C.A.) 64 F.(2d) 628; United States v. Hughes (D.C.) 6 F.Supp. 972. This is an action, however, against the bank commissioner of the state and the liquidating agent to establish a preference claim under the statute which provides that any debt due the United States by an insolvent person shall be first satisfied. A preference may be asserted where money of the United States is wrongfully deposited by a paymaster in the army to his individual credit in a bank and subsequently passed through an intermediary to another bank which receives it with knowledge that it belonged to the United States, and is later adjudged to be insolvent. A misapplication of that kind constitutes a criminal misappropriation of funds and title never passes from the United States. Bayne v. United States, 93 U.S. 642, 23 L.Ed. 997. Money which the United States has in its possession for the use and benefit of Indian wards, and which is deposited in a bank in the name of the United States by the superintendent of the reservation, secured by a bond payable to the United States, also comes within the statute, Bramwell v. U. S. Fidelity & Guaranty Co., 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368; and like money deposited by a cashier and special disbursing agent to his official credit under the protection of a bond running to the United States will support a claim, Barnett v. American Surety Co. (C.C.A.) 77 F.(2d) 225. That conclusion is inescapable because in each instance of that kind the transaction is in effect between the United States and the bank. The bank has on deposit money which belongs to the United States and, of course, it constitutes a debt due the United States. Here the money was not wrongfully withdrawn from the treasury. As we have undertaken to demonstrate, it was withdrawn and paid to the administrator with authority of law. The United States had no further interest in it immediately thereafter, except in its capacity as guardian to see that it was used to discharge the debts of the decedent, and when the time arrived for that purpose to see that the distribu-

tive shares were paid to the minor children. The transactions through which the guardian acquired the time certificates and made the deposits in the checking account were exclusively between the guardian and the bank. The relationship of debtor and creditor was created between them. The United States was not a party to the transaction and it could not have compelled the bank to pay . the money to it without appropriate action in court. The act requiring a guardian to make restoration and authorizing the Secretary to institute suitable actions to compel him to do so created a right in the United States to recapture the funds and property and cause their return to the treasury. But it cannot be construed to effect such a debt from the bank now in liquidation to the United States as comes within section 3466 (31 U. S.C.A. § 191), supra. Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp., 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762; Spicer v. Smith, 288 U.S. 430, 53 S.Ct. 415, 77 L.Ed. 875, 84 A.L.R. 1525. That section must be construed liberally, especially in a case of this kind involving the rights of Indian wards. Bramwell v. U. S. Fidelity & Guaranty Co., supra; Price v. United States, 269 U. S. 492, 46 S.Ct. 180, 70 L. Ed. 373. But the rule of liberal construction has its limitations beyond which a court cannot go.

For the reasons indicated the bill should have been dismissed. The decree is therefore affirmed.